*In re* MYRA BURNS, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* MYRA BURNS, Respondent-Appellee.)

First District (3rd Division)   No. 78-24

───

Opinion filed December 18, 1978.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Joseph P. Quirk, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel), for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

At issue is whether the juvenile court judge abused his discretion in deciding that the defendant Myra Burns, a minor, should remain under the jurisdiction of the juvenile court and that prosecuting her under the criminal law for her alleged role in the armed robbery and murder of Abraham Abdallah in Chicago on May 27, 1977, would not be in the best interest of the minor defendant or of the public.

We believe this is the first time in Illinois that a reviewing court has considered whether a juvenile court judge abused his discretion in deciding that a minor should not be prosecuted as an adult.[1] In *People v. Martin* (1977), 67 Ill. 2d 462, 367 N.E.2d 1329, the court held that denial of

---

[1] In the following cases, orders allowing transfer to adult jurisdiction were appealed: *People v. Taylor* (1978), 61 Ill. App. 3d 37, 377 N.E.2d 838; *People v. Underwood* (1977), 50 Ill. App. 3d 908, 365, N.E.2d 1370; *People v. Curry* (1975), 31 Ill. App. 3d 1027, 335 N.E.2d 515; *People v. Banks* (1975), 29 Ill. App. 3d 923, 331 N.E.2d 561.

such a transfer motion was an appealable order, and remanded the case to the Fifth District Appellate Court for review of the denial on the merits. That appeal became moot, however, when the defendant died before the appellate court acted.

■■ In exercising discretion, the juvenile court must consider the six factors enumerated in section 2—7(3)(a) of the Juvenile Court Act (the Act) (Ill. Rev. Stat. 1975, ch. 37, par. 701—1 *et seq.*), designed to guide it in deciding whether a juvenile should be prosecuted as an adult; in our review, we must determine whether the court's conclusion after applying those factors was an abuse of discretion. That paragraph of the Act provides:

> "(3) If a petition alleges commission by a minor 13 years of age or over of an act which constitutes a crime under the laws of this State, and, on motion of the State's Attorney, a Juvenile Judge, designated by the Chief Judge of the Circuit to hear and determine such motions, after investigation and hearing but before commencement of the adjudicatory hearing, finds that it is not in the best interests of the minor or of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws.
>
> (a) In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." Ill. Rev. Stat. 1975, ch. 37, par. 702—7(3)(a).

The defendant concedes in this court, as the trial court found, that at the hearing on the State's motion to permit the defendant's prosecution as an adult, the State presented sufficient evidence implicating her in an armed robbery and murder for a grand jury to return an indictment on both offenses. Our review of the record confirms that the evidence presented was adequate for this purpose.

The evidence showed that the defendant was involved in the stabbing and murder of Abraham Abdallah on May 27, 1977. It appears that Kenneth Brown, a friend of the defendant, was the active, knife-wielding killer. Kenneth Brown in fact admitted that he did the stabbing,

although in his first statement to the police he said the defendant did the stabbing. The lone eyewitness to the incident told a police investigator that he heard the defendant tell Brown, her companion at the time, that she felt like sticking someone up. The eyewitness also stated that the defendant became frightened when Brown started to stab Abdallah, who happened to be passing by, and asked Brown to stop stabbing the man. But, following the stabbing, the defendant removed currency from the pockets of the deceased. Thus, if the only consideration were whether a grand jury could be expected to return an indictment on the evidence presented, transfer of this case to the criminal court would be required.

■■ However, evaluation of the other five factors listed in the above-quoted statute and of the defendant's case as a whole, leads us to the conclusion that there are sufficient reasons not to disturb the juvenile court judge's ruling. The second consideration suggested by the statute is whether the alleged offenses were committed in an aggressive and premeditated manner. The evidence adduced at the hearing demonstrated that the defendant initiated the incident by expressing her desire to hold someone up; and she made her suggestion sufficiently before the incident occurred to warrant the conclusion that the armed robbery was premeditated. Nevertheless, nothing in the record suggests that she carried a knife or stabbed the murder victim, or that she encouraged the murderer or participated in the murder. On the contrary, her companion admitted to stabbing the victim, and the State's eyewitness said that the defendant was very frightened and asked her companion not to stab the victim. Therefore, although the evidence presented showed that the defendant's participation in the robbery was premeditated, and even that she may be legally accountable for the murder which occurred, the evidence also suggests that she did not premeditate, or even take part in, the actual stabbing. The State pictures the defendant as a knife-wielding murderess who joined in killing an innocent man in cold blood; the evidence, however, shows that the defendant was a 15-year-old girl at the time of the murder, who suggested a robbery, became upset when her companion turned to violence, and attempted to stop the unplanned killing.

And it is at this point that the third consideration pointed to by the statute, the minor's age, deserves some attention. At the time of the incident in question, Myra Burns was 15 years old: an age where the path a person's life may take remains very much an uncertainty. It is an age where it is too early to give up easily or in frustration or exasperation the hope that a young person will ever become a productive member of our society. This generalization is particularly apt in the light of the personal history of Myra Burns, as portrayed by the evidence at the juvenile court hearing.

The remaining evidence introduced at the hearing, encompassing the defendant's history and her emotional and psychiatric problems, related to the last three factors set out in section 2—7(3)(a). It consisted of a 12-page social investigative report prepared by a Cook County juvenile probation officer, Russell Ladson, Mr. Ladson's testimony before the juvenile court judge covering the disposition he recommended for the defendant, and two written psychiatric evaluations, one by a registered psychologist and one by a psychiatrist. No evidence was offered by the State to demonstrate that the reports offered by the defendant were inaccurate or misleading or that the opinions expressed therein were not well founded.

According to the report prepared by Probation Officer Ladson, the defendant was born in Wisconsin on September 9, 1961. Her mother, Wilma Burns, had her own full measure of emotional problems and instabilities, and they had an adverse effect upon her daughter early in life, depriving the defendant of a stable home environment. Her mother worked at a number of different jobs, including employment as a truck-farm laborer and as a shake-dancer. The mother had hard times as her daughter was growing up; she traveled a good deal, raising her daughter in a variety of insecure situations, sometimes including sleeping in abandoned cars. The defendant's father was not married to her mother, and he made no contribution to the welfare of the defendant or her mother. During her early years, the defendant not only had no father, but she also was exposed to a number of relationships her mother had with different men. Whenever these relationships terminated, the defendant herself felt rejected. The defendant's grandmother, who would from time to time attempt to care for her, and in fact was given custody of the defendant at one time, felt that the mother was not a proper parent. And Probation Officer Ladson suggested in his report that the defendant's problems began long before her initial court contact in Wisconsin in 1972 when she was 10 years old, largely because her mother was never able to properly supervise and care for her.

Around 1970, the defendant's mother became deeply religious. She quit her job and became a recipient of public assistance in order to stay home with the defendant, but, owing in part to the intensity of the mother's religious convictions, staying in one place became impossible. The mother would "wear out her welcome" in one temporary living arrangement after another. Frequently without food or shelter, the defendant often ran away on these occasions. She would then use her skill in establishing short-term relationships with persons who fed and sheltered her for several days at a time.

After initial attempts in Wisconsin to find a home for the defendant were unsuccessful, the mother and daughter came to Chicago in 1974.

The mother told Mr. Ladson that she brought her daughter to Chicago to get some treatment and counseling for her; however, reports prepared by Milwaukee social workers indicated that both the defendant and her mother were receiving counseling and therapy in Milwaukee. The mother apparently left Milwaukee because authorities there were threatening to take the defendant away from her again.

Probation Officer Ladson had the defendant committed to the Department of Children and Family Services around this time but placements arranged for her did not succeed. She would run away and often steal things from the homes in which she was placed. During this period the mother stayed in one apartment for a whole year; the commitment was therefore vacated and the defendant returned to her mother.

The growing intensity of the mother's religious convictions began expressing itself in ways the defendant felt oppressive. For example, the defendant was not allowed to associate with anyone who was not, in her mother's view, "saved." The mother also began bible study at a Chicago religious institution, and that, combined with her other religious activities, kept her away from home most of the day. In addition, the defendant's mother was giving money she and the defendant could have used for essentials to her church.

The defendant's previous behavior problems reappeared. She ran away, and on some occasions she became involved in auto theft. However, though she ran away, Myra always maintained weekly or biweekly contact, through telephone calls or visits, with her probation officer. The defendant's mother disappeared from the city in early 1977.

Probation Officer Ladson noted in his report that the defendant had at least several brushes with the law each year from 1972 to 1976, on various charges including theft, running away from her mother's home or a children's or foster home, criminal trespass to a vehicle, and auto theft. And it detailed the numerous times she had been placed in foster homes and children's homes.

Thus, the evidence presented in the juvenile court showed that the defendant's history was indisputably one of neglect, deprivation, emotional impoverishment and chaos. It was a history of repeated, almost continual, minor skirmishes with the law. But it was never a history of the use of weapons and she never had been implicated in violence toward other people. Her history tends to favor treatment as a seriously troubled adolescent rather than incarceration as a hardened adult. This view is even more compelling when the psychologist's, psychiatrist's and probation officer's findings and recommendations about the defendant, as presented at the transfer hearing, are evaluated in terms of the fifth and sixth factors set forth in section 2—7(3)(a): whether facilities are available

for the minor's treatment and rehabilitation, and whether the minor's best interest and the public's best interest require that the minor remain in custody or under supervision even after the minor becomes an adult.

At the transfer hearing, the reports prepared by the psychiatrist, Dr. Gerald Cohen, and by the psychologist, Dr. Mark Goldstein, were presented as evidence. Each report stated that the defendant was in urgent need of psychiatric care. Dr. Goldstein, in his report, referred to a report prepared by Dr. Cohen in November 1976, in which the defendant was described as "a profoundly emotionally disturbed youngster, not presently displaying florid symptomatology, who has clearly gone from pillar to post with a schizophrenic mother." Dr. Goldstein also referred to another psychiatric evaluation prepared in 1975 by a Dr. Heintz of the juvenile court who concluded that the defendant was a borderline schizophrenic. As a result of Dr. Cohen's evaluation in November 1976, the defendant was found in need of psychiatric hospitalization and sent to the Madden Mental Health Zone Center in Maywood, Illinois for that purpose. However, her stay there lasted only 2 days, for Dr. Mercedes Navarro, evidently a member of the Madden staff, disagreed with Dr. Cohen's findings and recommendation. Dr. Navarro suggested that the defendant was "not a psychotic adolescent, but rather a psychopathic personality." Dr. Navarro therefore concluded that she did not require psychiatric treatment, and recommended instead that she go to a boarding school or facility for young women of psychopathic behavior. She was rejected by two boarding schools in which the juvenile authorities attempted to place her, apparently because of her history of running away from homes in which she had been living, and the result was that, in effect, the defendant received no help after Dr. Navarro rejected Dr. Cohen's recommendation.

Dr. Goldstein's own findings began with the suggestion that the defendant "is a teenage girl of average and possibly bright average or superior intelligence who is not impaired by learning disability nor [by] neurological dysfunction." Dr. Goldstein found her to be significantly disturbed, not yet psychotic, but beset by characterological disorder. He found that she exhibited poor judgment and that she could be dangerous to others. Dr. Goldstein stated that the defendant longed for an adult to care for her, but that she had experienced so much rejection in her life that her capacity for trusting others had been impaired. He unequivocally recommended a structured environment, either at the Illinois State Psychiatric Institute, or at the Department of Corrections.

The second psychiatric report prepared by Dr. Cohen on October 31, 1977, one year after his first evaluation, stated:

> "Myra Burns is a tall, obese, nice-looking, bright, verbal, outgoing Black teenager. She has been out on her own on the

streets for most of this past year, and for most of the previous year after psychiatric hospitalization had been denied her at the Madden Zone Center."

Dr. Cohen noted that "when Myra naturally wearies and tires of attempting to take care of herself at the age of sixteen, * * * she perhaps finds herself in difficulties with the police, perhaps in a way asking for help, protection, without being aware of it." Dr. Cohen again recommended psychiatric hospitalization:

"* * * again I deem it imperative that she be hospitalized * * * or institutionalized in a facility that can provide [psychiatric] consultation."

Probation Officer Ladson, who had known Myra Burns for 2 years prior to the hearing, described the duration and quality of his contacts with her, and was then asked by the assistant state's attorney what disposition order he would recommend if the defendant were adjudged delinquent. His response was commitment to the Juvenile Division of the Department of Corrections. Asked what other types of services or plans he would recommend for her, Mr. Ladson replied that she would benefit from placement in a therapeutic setting, and that such settings or placement would be available through the Department of Mental Health.

Mr. Ladson indicated that his opinion respecting what would best serve her interest was based upon his 5-years' experience as a juvenile court probation officer, his work with and observations of the defendant over 2 years, and the reports which had been offered in evidence. Mr. Ladson pointed out that none of the defendant's numerous previous court referrals were based upon a charge alleging violence toward others. He also emphasized that although the defendant had been placed in a number of foster homes, she had never received, or been offered, any professional psychiatric help, despite the uniform recommendation by all those who evaluated her—except for Dr. Navarro—of her urgent need for such help.

Finally, Mr. Ladson expressed the opinion that the defendant should remain in the juvenile system, stating that she had never had proper supervision, that she does not have exceptional difficulties when placed in a structured setting and that she is intelligent and has shown an interest in trying to further her education.

An examination, then, of the psychiatric, psychological and social evaluations of Dr. Cohen and Dr. Goldstein and Mr. Ladson and their recommendations at the juvenile court hearing discloses unanimous agreement that the defendant could be, and should be, treated in a facility equipped to provide her with obviously-needed psychiatric treatment—treatment she never received despite her all-too-apparent need for it and the likelihood she would benefit from it. While the State contends that the

defendant was not in need of mental treatment, it supports this position only by referring to the Madden Center's refusal to admit the defendant; the record, however, is devoid of any report or testimony introduced by the State setting forth the opinion of anyone professionally qualified to evaluate the defendant's need for psychiatric care, who interviewed her after her apparent involvement in the murder.

The State also advances the view that whether the defendant is in need of mental treatment is irrelevant to the disposition of the motion to transfer her to adult jurisdiction. The fallacy of this argument is demonstrated by reference to the provisions of section 2—7(3) which in several respects requires the court to give attention to a minor's mental and emotional problems. It directs the juvenile court to consider whether retention in the judicial system is "* * * in the best interests of the minor or of the public * * *." A determination of the minor's best interests could not possibly exclude consideration of the minor's mental health and the minor's need for and amenability to psychiatric treatment. When the court is specifically directed by section 2—7(3)(a) to consider the history of the minor, there is no reason why this consideration should not include the minor's mental and psychiatric history. And when the court is also directed to consider whether facilities are available for the treatment and rehabilitation of the minor, this mandate obviously includes facilities for treating psychiatric problems. In addition, meaningful consideration of whether the best interests of the minor may require custody or supervision extending beyond minority, as section 2—7(3)(a)(6) directs, contemplates a prediction of future conduct, and such a prediction, if it is to be made with reasonable psychiatric certainty, must be based upon a thorough psychiatric diagnostic evaluation. Further, the six factors enumerated in the statute are to be considered by the juvenile court "among other matters" indicating the legislature's intent that the juvenile court judge's inquiry is not limited to these six factors. Finally, the State's argument that the defendant's mental health is irrelevant is also defeated by the references in sections 1—2, 1—2(3)(b), 5—1(3), 6—3(3), and 7—3(3) of the Act to the mental and emotional health of those the Act seeks to benefit.

The State also argues that the defendant, by her long series of transgressions and frequent difficulty with the juvenile authorities, "has thoroughly exhausted the energies, the faculties and the available facilities" of those authorities, and that her own conduct in the 5 years since her 10th birthday dictates that she now be dealt with by the criminal courts. However, Mr. Ladson and Drs. Cohen and Goldstein, speaking on behalf of the juvenile authorities, shared neither the prosecutor's impatience nor his exasperation with the defendant. Their view was that the treatment she required could be provided by the juvenile authorities. This

is in contrast to the State's failure to offer the testimony or opinion of any qualified professional that the juvenile court lacked facilities which could benefit the defendant.

On the basis of the record before us, the juvenile court judge could properly conclude that retaining jurisdiction in the juvenile court system could provide the defendant with facilities for psychiatric treatment that would be in her best interests and that she had a potential for rehabilitation. The reports of Drs. Cohen and Goldstein and the testimony of Mr. Ladson amply attest to this. The State, on the other hand, offered no evidence with regard to the treatment facilities which would be available for her if she was convicted as an adult, and, even more troubling, how she would receive the psychiatric treatment she requires were she tried as an adult and for some reason not convicted.

The statute also mandates that the juvenile court consider whether the public's security requires the defendant's transfer to the criminal court. Obviously, it is a serious concern to society and to this court that other members of the public as innocent as Abraham Abdallah not suffer his fate at the hands of the defendant or her future companions. But, unfortunately, no one can guarantee that the defendant will be released from the juvenile court system or, for that matter, from a penitentiary, and never participate in another crime. And no one can even predict with any degree of accuracy the chances that she will receive proper treatment before being released: specialists err, systems break down, and statistics are often of little comfort. We are speculating here on what might happen in the future, and on the basis of the evidence before the juvenile court judge, we cannot conclude that he abused his discretion by denying the defendant's transfer to adult prosecution. The judge could reasonably have decided on the basis of that evidence that the defendant is not a destroyer of life—that she does not inflict bodily harm on others, and becomes upset when others do. This is a major factual distinction between this case and *People v. Curry* (1975), 31 Ill. App. 3d 1027, 335 N.E.2d 515, a decision the State strongly commends to our attention. In that case, where the court allowed a transfer motion, the defendant admitted to entering the deceased's home, drawing and cocking his pistol, entering a bedroom, and shooting the victim. Also, the defendant's companion in *Curry* stated that earlier that day the defendant said he was bloodthirsty and felt like killing someone.

Were we to hold here that the juvenile court judge abused his discretion, our decision would in effect take away the force of the statutory mandate expressed in section 2—7(3)(a) of the Act, and mean that a juvenile court judge passing on a transfer motion in a case involving loss of life would have no choice but to allow adult prosecution. And such a result would also elevate the extent to which the minor's offense shocks

the public conscience above the other factors the statute mandates courts to consider in a proceeding of this type.

In resolving this appeal it is helpful to bear in mind the admonition of the United States Court of Appeals for the District of Columbia when it said: "The divide between the Juvenile Court with its promise of non-punitive rehabilitation and the harsher world of the District Court is one not lightly to be crossed." (*Haziel v. United States* (D.C. Cir. 1968), 404 F.2d 1275, 1278.) Ultimately, we believe, as did the juvenile court judge, that the best interest of the public will be served if the defendant remains in the juvenile court system. Given the defendant's sorry upbringing, her lack of a history of violence and the benefits she could receive from proper mental treatment, we believe that the juvenile judge's refusal to transfer her case will serve her best interests while posing only a minimal threat to society.

Order affirmed.

McNAMARA and JIGANTI, JJ., concur.