*In re* M. D., a Minor.—(The People of the State of Illinois, Petitioner-Appellant, *v.* M. D., Respondent-Appellee.)

First District (4th Division) No. 81—1063

Opinion filed October 7, 1982.

LINN, J., dissenting.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel), for appellee.

JUSTICE ROMITI delivered the opinion of the court:

The State appeals from the denial of its motion to permit prosecution of the minor-respondent, M. D., as an adult under the criminal laws. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).) The sole issue on appeal is whether the trial judge abused his discretion by denying the State's motion. We find that he did not and consequently affirm the order of the trial court.

The petition for adjudication of wardship filed in the juvenile court alleged that respondent was delinquent in that on January 26, 1981, he committed murder by shooting and killing Vincent Jackson and Gregory Jackson. At the hearing on the State's motion to permit the prosecution of the respondent as an adult the following pertinent evidence was adduced.

Officer Ralph Vucko testified concerning certain statements made to him by respondent concerning the shootings. Respondent said that at about 6:30 p.m. on January 26, 1981, he went to the home of Izear Sewell, known as Tookie, to ask Sewell for help because Gregory Jackson had hit him across the face with a pistol. Respondent, who stated that he wanted to get revenge, was armed with a gun when he went to Sewell's house. Sewell agreed to help, saying they should "gun up," and as they left he told respondent he also had a gun. They went to a laundromat where they encountered Gregory Jackson. Respondent told Sewell "talk to the dude, he jumped on me a couple of times, man." Sewell told Gregory he should leave respondent alone. According to respondent Gregory took a stick out of a garbage can and began walking toward them. (However three other eyewitnesses interviewed by Vucko did not see any stick.) Gregory also called Sewell a "punk." Sewell shot Gregory and then respondent also fired at him, although he claimed to have missed him. When Vincent Jackson started to come towards them, they shot at him. Respondent stated that he shot Vincent four times. Respondent and Sewell then ran to an apartment, where Sewell put both guns on a shelf.[1]

When Vucko saw respondent the night these statements were

---

[1]Sewell, age 22 at the time of the shooting, was separately prosecuted as an adult.

made respondent had scab marks about his face which he said were the result of the pistol-whipping by Gregory a week earlier. Respondent also told Vucko that Gregory and Vincent were in a gang called the "Q-Dogs," which was part of another gang. Vucko had never heard of the Q-Dogs but conceded that he did not work with the gang crimes unit of the police department and was not familiar with every gang in the area.

Jeffrey Greenfield, an investigator for the office of the Public Defender, testified to an interview he conducted with Bernard Strowder, who had known the respondent for three to four years and the Jackson brothers for two years. Strowder told Greenfield that the Jacksons were members of the Q-Dogs, which was part of the Vice Lords. Strowder also recounted several incidents involving Gregory Jackson and the respondent. On one occasion Gregory and another boy approached respondent and Strowder and forced them at gunpoint to give them money. Another time Gregory told the respondent "you owe me" and hit him with a stick. According to Strowder, Gregory had also struck respondent with a gun and on another occasion he and Vincent pushed respondent off a bike and struck him. Greenfield testified that he knew the Q-Dogs to be a street gang.

Respondent's mother testified that on January 24, 1981, she learned from respondent and her nephew that Gregory Jackson and another person had threatened respondent with a gun in an effort to obtain a microwave oven. The next morning respondent returned from a trip to the store with his eye and face swollen. He told her that Gregory Jackson had beaten him up. Respondent's mother called the police and reported this, a fact verified at the hearing by a police tape recording.

Three reports were submitted to the court for its consideration. One was a social investigation report prepared by probation officer Vergus Hurks, who also testified at trial. In his report and testimony Hurks related the following. Respondent was born July 11, 1965, and was 15 years old at the time of the hearing. He was living with his unemployed mother and eight siblings in a public housing complex. His mother reported that he associated with older children she did not approve of and these children were a negative influence in his life, resulting in his delinquent behavior and truancy. She believed male supervision would be beneficial, but said there was no male role model in the home as she had been separated from her husband since 1977.

Respondent had been placed on probation for one year because of a finding of delinquency based on his commission of a burglary. That probationary period was satisfactorily completed on January 20, 1981.

Hurks had been respondent's probation officer and he reported that respondent had cooperated with him and had complied with the conditions of his probation. During this period respondent was referred to the Garfield Park Comprehensive Health Center for counseling. His counselor reported that he had made progress there but then had lost interest and had failed to keep his appointments. Respondent also had eight prior station adjustments dating from August 1979 to October 1980.

In his testimony Hurks stated that he considered respondent to be a follower who was shy and passive. He believed respondent had rehabilitative potential but cited one problem as being the lack of a male role model. He stated that the juvenile division of the Department of Corrections had programs to provide role models for minors and he believed respondent could benefit from such programs. Although he reported that respondent had been failing his school courses at the Audy Home, Hurks expressed his belief that respondent could benefit from the school programs available in the juvenile division. It was his opinion that respondent had rehabilitative potential within the juvenile system.

A second report submitted to the court was that of Kimberly Merrill, the court psychologist, who examined and tested respondent. She found that respondent's test scores placed him in the mentally deficient range. However, it was her belief that these results were at least partially attributable to the confusion and sense of disintegration which resulted from respondent's extreme anxiety about his current situation. Merrill found respondent to be extremely immature. He was uncertain about his own masculinity and appeared to confirm that masculine identity through association with older boys and the use of weapons. Merrill found that he was extremely impulsive and exhibited a childish fascination with violence. She concluded:

> "[Respondent] is dangerous, but he is not a hardened delinquent. He has reached the age of fifteen without acquiring appreciable socialization. He needs structure, limits and firm moral instruction. Long term residential placement is recommended, and [he] needs to understand that he can expect punishment for wrongdoing. It should be emphasized that the moral environment provided by this placement will play a critical role in the development of [his] emerging personality."

The court also received a report from a psychiatrist, Dr. Jaime Trujillo. Dr. Trujillo found respondent to be operating in the low normal range of intelligence, making him "an easy prey for persons who could socialize with him and try to induce him into certain criminal ac-

tivities without him having full understanding \*\*\*." Dr. Trujillo found respondent to be dangerous because he was impulsive, lacked internalized discipline, and did not have a code of morals to control himself. He recommended that respondent be "treated in a closed secured environment where good disciplinary measures are imposed upon him so that he can realize that he has to comply with certain societal norms \*\*\*." In this placement Dr. Trujillo recommended that respondent have education aimed at overcoming his learning difficulties and individual therapy to treat his lack of values and his self-centeredness.

## I

Section 2—7(3) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701 *et seq.*) lists six factors to be considered by the trial court in determining whether a minor should be prosecuted as an adult:

> "\*\*\* (1) whether there ·is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." (Ill. Rev. Stat. 1979, ch. 37, par. 702—7(3)(a).)

Our function on review is to determine whether in the light of these factors the trial court abused its discretion in making its decision. *In re Burns* (1978), 67 Ill. App. 3d 361, 385 N.E.2d 22.

In this cause it is clear there was sufficient evidence to support an indictment of the respondent for murder. However, the evidence concerning aggression and premeditation is not as clear. Respondent admitted to having armed himself and then sought "revenge" with the aid of Izear Sewell. But according to his statement he also asked Sewell to talk to Gregory Jackson, and it was only after Gregory advanced with a stick that Sewell and then respondent fired at him. Again, according to respondent, Vincent was shot only after he too advanced toward them. There was evidence that the Jacksons had physically attacked respondent in the past, including a pistol-whipping by Gregory administered within a week of the shooting, and this history could have caused respondent to arm himself. Thus the trial judge could have concluded that, contrary to the State's suggestion, these were not premeditated revenge killings. Still, it is clear that the

actions of the respondent resulted in the violent deaths of two young men, and thus it becomes even more important to examine the remaining evidence concerning respondent's personal history and the evaluations of the experts who examined him.

Respondent was 15 years of age at the time of the shooting. The court was informed that he was also immature, shy and passive. Both the psychiatrist and the psychologist who examined him found him to be of lower than normal intelligence although one expert believed this finding to be in part attributable to the respondent's current stressful situation. Dr. Trujillo found that this low intelligence made respondent vulnerable to being induced by others to perform criminal acts. Both experts found respondent to be dangerous but not beyond treatment, and both recommended residential placement in a structured, disciplined environment. Merrill emphasized in her report that the moral environment of this institution would be critical to respondent's development. Probation officer Hurks, who had supervised respondent during his successfully completed one-year probation, and who was familiar with the station adjustments in which he had been involved, informed the court that he believed respondent could benefit from the programs available in the juvenile division of the Department of Corrections. The State failed to present evidence that facilities benefitting the respondent would not be available to him in the juvenile system. (See *In re Burns* (1978), 67 Ill. App. 3d 361, 385 N.E.2d 22.) Indeed, it is clear that the trial court accepted the opinion of the State's own witness, Hurks, that the respondent had rehabilitative potential within the juvenile system.

Based on this evidence we find no abuse of discretion in the trial court's denial of the State's motion.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., concurs.

JUSTICE LINN, dissenting:

With all due respect, I disagree with the majority. Based upon the evidence presented in connection with the transfer hearing, it appears clear to me that the trial court abused its discretion in concluding that the minor respondent should be tried as a juvenile in the juvenile court setting and not as an adult in the criminal court. See Ill. Rev. Stat. 1981, ch. 37, par. 701 *et seq.*

The evidence discloses that two vicious, heinous, premeditated murders had occurred and that the respondent may well have been involved in the brutal killings. As noted by the majority, the respondent acknowledged that he had armed himself, enlisted the aid of an acquaintance, and proceeded "to get vengeance." Such an assertion coupled with a later deliberate execution of the intended act surely indicates the malevolent attitude and criminal character of the actor.

It appears to me that the respondent's prior delinquency record (a burglary conviction with a probationary sanction coupled with eight previous station adjustments) unequivocally directs that trial of the defendant as an adult is in order. In view of the evidence presented, the six factors to be considered by the trial court in making its transfer determination compel the trial court to order the requested transfer. I am, of course, aware of the well-established rule that a reviewing court is not justified in substituting its discretion for that of the trial court. But to me it remains evident, considering all of the circumstances, that to deny a transfer to the criminal court for trial of the respondent as an adult is to act arbitrarily so that legal principles are overlooked and a substantial injustice occurs.

The juvenile court was established on the premise that younger people need special protection and consideration. Assertedly, their youth makes them more vulnerable and somehow less criminal than older law breakers who by dint of a few added years are considered more adult and therefore more responsible for their actions. Many youngsters have been helped and set on the right track because the juvenile court has provided the right service at the right time for those minors whose character was still malleable enough for proper role modeling, education, and therapy to have a positive effect. However, when the crime is a premeditated double murder and the respondent has an awareness of and experience with the criminal justice system, the interests and protection of society may well be paramount to the interests of respondent that are based on chronological age. In my judgment, immaturity of personality in the commission of such a heinous crime does not entitle respondent to extraordinary protection or consideration. I would allow the transfer motion and hold the respondent to trial as an adult.