THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, v. D.B., a Minor, Respondent-Appellee.

First District (2nd Division)   No. 1—88—3321

Opinion filed August 14, 1990.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

The State appeals from an order of the circuit court denying the State's petition to permit the prosecution of respondent D.B., a 14-year-old minor, for the offenses of murder, home invasion and residential burglary. This appeal presents two issues for our review: (1) whether the trial judge abused his discretion as delimited by sections 5—4 of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a)) when he declined to permit respondent to be tried as an adult offender; and (2) whether he precluded a meaningful review of his decision by failing to preserve his reasoning with sufficient particularity. We affirm.

On October 4, 1988, at about 1:30 p.m., respondent and two friends, Owen Parker (Owen), 15, and Patrick Brown (Patrick), 16, used a crowbar to break into the apartment of Allie Larkin, an elderly woman in her eighties, to rob her of her money. While they were searching her bedroom, Ms. Larkin returned inside from the front porch. The three boys lay in wait for her in the bathroom. As she passed by the door, Patrick hit her over the head with the crowbar, and she fell down. Respondent and Owen resumed their search. When she tried to get up, Patrick hit her again and held her down with his

foot. Finally, holding the crowbar with both hands, he struck her harder over the head. Without having found any money, the three boys escaped out the bedroom window. Ms. Larkin died later that day.

The State brought charges against Patrick, Owen and the respondent for first degree murder, home invasion and residential burglary. Because of their ages, Patrick and Owen were automatically transferred to adult criminal court pursuant to section 5—4(6)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(6)(a)), which provides that minors 15 years of age and older shall be criminally prosecuted for certain felonies, including first degree murder. Respondent, on the other hand, was charged as a juvenile on October 6, 1988, on a petition for adjudication of wardship. That same day, the State filed a motion to permit respondent's prosecution as an adult under the criminal laws, pursuant to section 5—4(3)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a)), which allows a judge to transfer a juvenile to adult court if in his discretion he finds that it is in the best interests of the minor and society to do so.

## THE TRANSFER HEARING

At respondent's transfer hearing on October 28, 1988, the State presented the testimony of two witnesses, Detective Ron Armata of the Chicago police department, and Gregory Harris, a juvenile probation officer. The parties stipulated that Dr. Perruza, a certified pathologist, would testify that the primary cause of Ms. Larkin's death was blunt trauma to her head, and the secondary cause, asphyxia due to a foreign object in her throat. Respondent did not present evidence on his own behalf.

On October 5, 1988, respondent dictated a written confession in the presence of Detective Armata. According to respondent, Owen was his friend, and Patrick was Owen's cousin, whom respondent knew only "so-so." Having learned from Patrick that Ms. Larkin had large sums of money, which she kept in her home and carried on her person, the three of them planned to burglarize her apartment. Patrick talked them into the burglary, which they discussed on some five occasions before carrying it out. On one such occasion, about a week before the burglary, they gathered on Patrick's porch across the street. Patrick timed Ms. Larkin with a stopwatch and determined that she stayed on her porch for at least 17 minutes at a time.

On October 4, 1988, they put their plan into action. Patrick checked to make sure that Ms. Larkin was on her porch with her neighbor, then entered her apartment through her bedroom window with a crowbar, followed by respondent and Owen. Once inside, Pa-

trick kept a lookout, while respondent and Owen began searching the drawers in the bedroom. Upon hearing a door open, they hid in the bathroom. Patrick stood by the door with the crowbar, respondent stood behind him, and Owen sat on the toilet seat. As Ms. Larkin walked past the door, Patrick hit her over the head with the crowbar, and she fell down. All respondent could see through the doorway was her feet.

Respondent and Owen resumed searching her bedroom for money. Meanwhile, Ms. Larkin tried to get up, and Patrick hit her again, holding her down with his foot. Respondent knew she was alive because he could hear her moaning. They continued their search for 5 or 10 minutes, but found no money. When Ms. Larkin tried to get up once more, respondent saw Patrick hit her much harder than before, with both hands on the crowbar. At this point respondent jumped out the window. According to his confession, it was part of their plan that Patrick would watch over her and that they had "talked about hitting her [but] not to do all that to her."

Later that day, some friends sent by Owen informed respondent that Ms. Larkin had died, and he and Owen discussed confessing their crime to the police. Respondent called his mother and told her everything, and on the next day, she accompanied him to the police station, where he turned himself in.

Detective Armata testified further that while inspecting Ms. Larkin's first-floor apartment at 6441 South St. Lawrence, Chicago, on the day after the murder, he observed a large amount of blood on the carpet and splattered on the walls about 10 feet from the bathroom. The two bedrooms were in complete disarray. The bedroom window through which the youths had entered was not visible from the front porch and was located about three feet above a four-foot high chain link fence.

According to a report prepared by Chicago police officer White, on the day of the murder he discovered Ms. Larkin's body lying adjacent to the bathroom. At that time she was possibly still alive and bleeding profusely from the head, which was covered in a blood-soaked sheet. Her ankles and her left wrist were tied with a belt.

The State's next witness, Gregory Harris, a juvenile probation officer, testified that he had conducted a social investigation of respondent and recommended retaining him under the jurisdiction of the juvenile court. In preparing his report, he took into account his interviews with respondent's teacher, assistant school principal and mother, respondent's delinquent background and a police report concerning the events of October 4, 1988.

Ms. Parker, respondent's teacher, at McCosh Elementary School, informed Harris that respondent was often truant, having missed six days of school in September and two days in October, including the day of the murder, October 4, 1988. She also said that she had a "bad feeling" about respondent because he was hanging around a group of bad friends, among whom was codefendant Owen. However, he was neither violent nor ever a problem to other students. The assistant principal of McCosh Elementary School told Harris that in his opinion respondent was "slick and sneaky."

Respondent's mother stated that she never had any problems with respondent at home: she was able to control him, and he was always jovial and very respectful to her and got along well with other members of the family. The main problem she had with him was his truancy, but there was little she could do about it because she worked during the day. When notified by the school on October 4, 1988, that he was missing, she had had no idea where he was.

During his interview with Harris, respondent cried and was concerned about his mother and his future. He talked about school and how wrong he had been for missing days. Harris noted that his behavior reminded him generally of the behavior of a young man.

Respondent's delinquent background included one court referral for possession of a stolen motor vehicle which the State had dismissed with leave to reinstate and one station adjustment for possession of marijuana.

Harris also considered a police report compiled by a youth officer, but, contrary to normal practice, did not review the general case report or the detectives' report, both of which were offered to him a week earlier by the State. During his questioning, the State confronted him with the gruesome details of the murder and brought to his attention other aggravating circumstances, including facts that the burglary had been planned for a month, that the victim, an elderly woman, was found with a blood-soaked sheet covering her head and with her hands and feet bound, that the victim's telephones had been ripped out of the wall, that a lead pipe and crowbar were recovered from the apartment, that codefendants Patrick and Owen had made self-incriminating statements and that both had automatically transferred to adult criminal court. Harris admitted knowing that respondent had made a confession taken by a court reporter and understood that according to the principle of accountability respondent could be found guilty as the person who actually killed Ms. Larkin. Harris testified, however, that none of these factors would persuade him to alter his conclusion in his report that respondent "was in the wrong

place at the wrong time" or to change his recommendation not to prosecute respondent under the criminal laws.

During cross-examination by respondent's counsel, Harris said he was aware that if tried under the criminal laws respondent's minimum sentence would be 20 years' imprisonment, but was not aware that the maximum could be natural life in prison if the judge found that the crime was committed in a brutal and heinous manner. In spite of this, Harris believed that, considering respondent's age, he could benefit from the educational and social setting, recreational programs and peer association at the juvenile division of the Department of Corrections, where he would be monitored much more closely than at an adult facility. He acknowledged, however, that if tried as an adult, respondent would receive the same services and remain in the custody of the juvenile division until his 21st birthday.

Harris testified during re-cross-examination that he did not have an opinion concerning the respondent's degree of maturity or at which stage of social development he should be according to his age.

In closing arguments, the State reviewed the evidence in light of the six factors the court must consider under section 5—4(3)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a)), and argued with reference to the sixth factor that it would be in the best interests of both respondent and society at large that he be kept in custody beyond the age of majority (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a)(6)). Respondent's counsel asked the court to consider that respondent could be rehabilitated in the next seven years and "does not present such a danger to himself or to society that would require the Court to incarcerate him beyond his majority."

The trial judge denied the State's motion to transfer respondent to the jurisdiction of the criminal courts. With respect to the first five statutory factors, the judge found that (1) although home invasion might have presented a problem because the victim was not inside the apartment when respondent entered (see Ill. Rev. Stat. 1987, ch. 38, par. 12—11), there was sufficient evidence for a grand jury to indict respondent for at least murder and residential burglary; (2) the offenses were premeditated; (3) at the time the offenses were committed, respondent was 14 years old, a "tender age," but if he were 15, he would have automatically transferred to adult criminal court; (4) respondent had no history of delinquency apart from one station adjustment and one court referral that was dismissed; and (5) whether prosecuted in the juvenile or criminal system, respondent would spend the first seven years in the custody of the same Department of Corrections. The judge addressed the sixth factor as follows:

"Then you come to the last question of whether it is in the best interest to keep the minor beyond his majority.

Therefore the Court denies the 5—4 Petition keeping the matter in Juvenile Court ***."

OPINION

Section 5—4(3) of the Juvenile Court Act provides as follows:

"(3) If a petition alleges commission by a minor 13 years of age or over of an act which constitutes a crime under the laws of this State, and, on motion of the State's Attorney, a Juvenile Judge, designated by the Chief Judge of the Circuit to hear and determine such motions, after investigation and hearing ***, finds that it is not in the best interests of the minor or of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws.

(a) In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a).)

This section was amended in response to the decision in *Kent v. United States* (1966), 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, wherein the Supreme Court held with respect to a transfer statute from another State that in order to pass constitutional muster, such a statute must set forth specific standards for the purpose of controlling the court's discretion. See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

In a transfer hearing, the burden is upon the State to present sufficient evidence to persuade the juvenile judge to grant a motion to transfer. (*Taylor*, 76 Ill. 2d at 304, 391 N.E.2d at 372.) Provided the juvenile judge considers each of the six statutory factors and any other relevant matters, his decision is "a product of sound judicial discretion which will not be disturbed on review." *People v. Clark* (1987), 119 Ill. 2d 1, 14, 518 N.E.2d 138, 144; *In re*

*Burns* (1978), 67 Ill. App. 3d 361, 385 N.E.2d 22.

Respondent correctly states that *People v. M.D.* (1984), 101 Ill. 2d 73, 461 N.E.2d 367, is the only Illinois decision reversing a juvenile judge's determination to retain jurisdiction. M.D. was charged with committing two murders at the age of 15. With the purpose of seeking out revenge against Gregory Jackson, a gang member who had allegedly assaulted and harassed M.D. in the past, M.D. armed himself with a weapon and enlisted the aid of a friend who was also armed. Together they "hunted down" Gregory at a laundromat, where a shoot-out occurred resulting in the deaths of Gregory and his brother, Vincent. M.D. shot Vincent four times, but missed Gregory, who was killed by M.D.'s friend.

M.D. had a lengthy history of delinquency, including a prior adjudication of delinquency for burglary for which he served one year of probation and eight station adjustments for various offenses, three of which occurred during his probationary period.

The court found that M.D.'s experience was far beyond his age of 15 years, because he abused alcohol and marijuana and had sex with two different girlfriends. Furthermore, the court noted that under the amended provisions of the Juvenile Court Act (see Ill. Rev. Stat. 1987, ch. 37, par. 805—4(6)(a)), as a 15-year-old, M.D. would have been automatically transferred to adult court.

A psychologist testified that M.D. was dangerous; and a psychiatrist stated that M.D. was proud of the murders and felt that he had a right to revenge. In the psychiatrist's opinion, if he were allowed back on the street, "he [would] be in bigger trouble."

Considering this evidence in light of the six factors set forth in section 2—7(3)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a), later recodified as Ill. Rev. Stat. 1987, ch. 37, par. 805—4(3)(a)), the supreme court found that the juvenile judge abused his discretion when he denied the State's motion to transfer M.D. to adult jurisdiction.

The State argues that *People v. M.D.* is a model for reversal in the present case, because the two cases are "nearly identical." As respondent points out, however, the similarity ends with the fact that both juveniles were charged with murder. Concededly, in both cases a grand jury indictment was highly probable, and the crimes were aggressive and premeditated, but in *People v. M.D.*, the court found that M.D. (1) had experience well beyond his age of 15 years; (2) had an extensive delinquent background, was consequently "very familiar with the criminal justice system" and would be automatically tried as an adult if the amended statute were applicable; (3) had been exposed

to the educational, counselling and therapy programs of the juvenile division in the past but had not benefitted from them; and (4) was of below normal intelligence and dangerous, so that his incarceration beyond the age of majority would be in the best interests of both himself and the public. The court also noted that the fact that a minor did not personally kill is an "important mitigating factor" not present in M.D.'s case.

None of the foregoing aggravating factors is present in the case of respondent D.B. In fact, although legally accountable for the murder, respondent did not personally kill. Several other mitigating circumstances, discussed below in the context of the six factors set forth in section 5—4(3)(a) of the Juvenile Court Act, militate against trying respondent in the adult criminal courts.

■ (1) *Possibility of indictment.* Respondent does not contest that a strong possibility of indictment exists for the crimes of murder and residential burglary. But he appropriately emphasizes that he did not personally kill, a fact which decisively persuaded at least one court, in *In re Burns* (1978), 67 Ill. App. 3d 361, 385 N.E.2d 22, to affirm a denial of transfer.

(2) *Premeditated and aggressive nature of offense.* It cannot be gainsaid that the torturous murder of an elderly woman with a crowbar during the course of a burglary is an aggressive and gruesome crime, especially in light of the fact that defendants planned to incapacitate the victim if she happened to return during the burglary. Nevertheless, the nature of the crime is only one factor among several which the court should use for guidance. As expressed in *In re Burns* (67 Ill. App. 3d at 370-71, 385 N.E.2d at 29), reversing a juvenile court's decision to keep the minor in the juvenile system for every crime involving loss of life "would *** elevate the extent to which the minor's offense shocks the public conscience above the other factors the statute mandates courts to consider in a proceeding of this type," in effect depriving the court of its legislatively endowed discretion. We also take into consideration that respondent confessed the crime to his mother the same night and to the police the very next day, acts that reflect respondent's remorse and a willingness to take responsibility for his wrongful behavior.

(3) *The age of the minor.* Respondent was 14 years old at the time of the offense. Unlike M.D., respondent was too young to qualify for the automatic transfer provisions of section 5—4(6)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 805—4(6)(a)). Also, unlike M.D., who admitted abusing alcohol and drugs and enjoying sex, respondent did not exhibit the experience of someone well beyond his

years. As respondent indicates, one station adjustment for possession of marijuana, although probative for the purpose of assessing his delinquent background, falls short of proving his involvement with illegal drugs. At the hearing, the probation officer and juvenile judge, both professionals experienced in juvenile matters who had an opportunity to observe respondent, concluded respectively that respondent possessed the emotions of a young man and was at a "tender age." Similar observations were never made with respect to M.D.

■ (4) *The previous history of the minor.* As noted above, respondent had one station adjustment for possession of marijuana and one court referral for possession of a stolen motor vehicle, which the State had stricken with leave to reinstate. A station adjustment occurs when the police take a minor to the police station, but release him after deciding not to prosecute. (*People v. M.D.* (1984), 101 Ill. 2d 73, 79, 461 N.E.2d 367, 370.) Although station adjustments are "probative and relevant" in transfer proceedings "because they enable the trial court to determine the proper disposition" (*People v. M.D.*, 101 Ill. 2d at 79, 461 N.E.2d at 370; *People v. Newell* (1985), 135 Ill. App. 3d 417, 481 N.E.2d 1238), they are no more than "a verbal warning from the police" (*People v. Clark* (1987), 119 Ill. 2d 1, 9, 518 N.E.2d 138, 141-42). After examining the details concerning two of three station adjustments of the minor in *Clark*, the court found him culpable in only one of the cases and concluded that he "had virtually no criminal history whatsoever." (119 Ill. 2d at 20-21, 518 N.E.2d at 147.) In the present case, in contrast to *M.D.* and *Clark*, respondent had had only one station adjustment, and the judge did not have the benefit of any evidence of the surrounding circumstances to help him determine respondent's culpability. Neither was there any evidence available concerning respondent's court referral for possession of a stolen automobile. Clearly respondent's familiarity with the juvenile justice system does not come close to that of M.D.; thus, the supreme court's decision to treat M.D. as an adult offender is not persuasive in this case.

(5) *Availability of juvenile facilities.* In *People v. M.D.* (101 Ill. 2d at 86-87, 461 N.E.2d at 374), the court noted that consideration of facilities particularly available to the juvenile division for the treatment and rehabilitation of a minor embraces two points. First, the court recognized that until the minor reached the age of 21, he would be kept in the same facilities regardless of whether he was processed as a juvenile or an adult. Under Illinois law, if respondent were convicted of murder in criminal court, he could serve a minimum of 20 years in prison and a maximum of natural life. (Ill. Rev. Stat. 1987,

ch. 38, par. 1005—8—1(a)(1).) With good time credit (Ill. Rev. Stat. 1987, ch. 38, par. 1003—6—3(a)(2)), this minimum could be reduced to 10 years; thus, even if he served the first seven years in the custody of the juvenile division, he would have to spend a minimum of three additional years in adult prison. Second, the court in *M.D.* inquired to what extent M.D. benefitted from juvenile programs in the past and found no evidence of any benefits, although the respondent had been through several such programs. In the present case, respondent was never exposed to any juvenile programs; hence, it would be premature to predict that he would not be amenable to treatment and rehabilitation in the juvenile system.

(6) *Whether the best interests of the minor and the security of the public would require keeping the minor in custody beyond his majority.* Apart from the commission of the offenses at issue, there is no evidence in the record that respondent is an otherwise violent or dangerous person. His teacher's greatest concern was that he had fallen in with a group of bad friends, and his mother stated that apart from his truancy she had never had any problems with him. It appears from the record that his relationship with his family was very good. And finally, as we have noted earlier, it was not respondent who wielded the murder weapon.

The State cites at least 17 Illinois cases affirming the transfer of minors to adult court. However, the facts in each of those instances are distinguishable from the facts at bar. For example, in the three cases which dealt with 13-year-old minors, the degree of their involvement in the commission of the alleged crimes was much greater than respondent D.B.'s. In *People v. Taylor* (1983), 113 Ill. App. 3d 467, 447 N.E.2d 519, *aff'd as modified* (1984), 101 Ill. 2d 377, 462 N.E.2d 478, respondent slashed a 17-year-old victim's throat and stabbed her in the chest. In *People v. Thomas* (1981), 94 Ill. App. 3d 895, 896, 419 N.E.2d 480, 482, after verbally assaulting two passersby on the street, respondent shot one of them in the back and ran up to the other, telling him "I hit the girl." In *People v. Jones* (1980), 86 Ill. App. 3d 253, 408 N.E.2d 79, *rev'd in part on other grounds* (1981), 85 Ill. 2d 559, 435 N.E.2d 1143, respondent entered the home of an elderly couple in the night, locked the husband in the basement and raped the wife at knifepoint, continuing his act even after the police arrived. In the present case, respondent played only a passive role in the acts that made this crime particularly violent and offensive. Thus, in light of our narrow standard of review, we are of the opinion that the trial judge did not abuse his discretion when he found that respondent should remain in the juvenile system.

■ The State also contends that this court should reverse the juvenile court's order on procedural grounds, because the trial judge did not specify his reasons for denying the motion to transfer with respect to the sixth statutory factor, which he merely restated before giving his decision. In *Kent v. United States* (1966), 383 U.S. 541, 561, 16 L. Ed 2d 84, 97, 86 S. Ct. 1045, 1057, the Supreme Court held that in a juvenile transfer hearing the court must state its reasons for its disposition "with sufficient specificity to permit meaningful review." With regard to the Illinois transfer statute, our supreme court held that "while no formal statement of reasons or conventional findings of fact are necessary, the juvenile judge must take care to preserve a record sufficiently explicit so that his exercise of discretion may be reviewed meaningfully." (*People v. Taylor* (1979), 76 Ill. 2d 289, 301, 391 N.E.2d 366, 371.) The court also found that the constitution does not require a "mathematical formula" to govern the trial court's decision. 76 Ill. 2d at 305, 391 N.E.2d at 373.

Significantly, in *People v. M.D.* (1984), 101 Ill. 2d 73, 461 N.E.2d 367, the juvenile judge failed to provide any formal statement of reasons or findings of fact with respect to his decision to keep M.D. in the juvenile system. Nevertheless, after referring to the rule in *Taylor*, the court proceeded to review the juvenile judge's exercise of discretion by examining the evidence in the record. 101 Ill. 2d at 84, 461 N.E.2d at 373; see also *People v. Underwood* (1978), 72 Ill. 2d 124, 127, 378 N.E.2d 513, 514-15.

■ Since all of the evidence which the trial judge in the instant case had at his disposal in making his decision is also before this court, his failure to specify his reasoning with respect to the sixth factor is not fatal. Moreover, considering that in *M.D.* the court reversed the judge's decision without a formal record of his reasoning, we do not hesitate to affirm on a record that is more complete.

Affirmed.

DiVITO, P.J., and BILANIC, J., concur.