*In re* R.L.L., a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* R.L.L., Respondent-Appellee.)

Fourth District    No. 4-82-0005

Opinion filed May 12, 1982.

WEBBER, J., dissenting.

Tyrone C. Fahner, Attorney General, of Springfield, and Daniel Arbogast, State's Attorney, of Toledo (Michael Vujovich and Michael V. Accettura, Assistant Attorneys General, of counsel), for the People.

Daniel D. Yuhas and James G. Woodward, both of State Appellate Defender's Office, of Springfield, for appellee.

JUSTICE LONDRIGAN delivered the opinion of the court:

R.L.L., a minor, was arrested on May 1, 1981, and charged with the murder of Veva Dengler, his foster mother. A detention hearing was held on May 4, 1981. A statement made by the minor after his arrest in Dyersburg, Tennessee, was admitted into evidence. In the statement, the minor is quoted as saying:

"[S]he [Mrs. Dengler] finally got me mad on that day and * * * I went in and I took a friend's knife and I went into the bedroom * * * she was laying there asleep. And I stabbed her twice. And she got up and screamed * * *. And I ran over, I took her purse and I ran outside and I got in the car and I took off."

When asked why he had become angry with Mrs. Dengler, R.L.L. stated:
"[W]e were almost constantly arguing the whole time I lived there and she wouldn't listen to what I was trying to say to her. She wouldn't let me explain to her, if I done something * * * that I didn't mean to do * * * she'd * * * yell at me, and I tried to explain to her and she wouldn't listen to me. And, finally it just built up * * *. [I]t just kept building up and building up and then I finally * * * I just went crazy."

At the conclusion of the detention hearing, the trial court ordered the minor detained pending adjudication. The State also filed a motion seeking to have R.L.L. tried as an adult pursuant to section 2—7(3)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 702—7(3)(a)).

A hearing on the motion was held on December 16, 1981. Luke Holsapple, sheriff of Cumberland County, testified regarding the details of the homicide and the subsequent apprehension of the minor. The State then called Michael Hughes, the chief probation officer of Coles and Cumberland counties. He stated that no secure facilities, other than the county jails, existed in the two counties in which a juvenile adjudicated delinquent as a result of a homicide offense could be held.

The prosecution then asked Hughes to state his opinion as to the facility or agency that would best serve the needs of a minor adjudicated delinquent for committing a homicide offense. At this point, the following exchange took place:

"A. If I understand the question correctly, first of all state in my opinion—and this would be in the form of social history investigation or pre-sentence investigation—in my opinion probation would not be a suitable disposition in the case due to the fact that we do not offer any secure settings to begin with or during the course of probation.

Q. Thank you. I don't mean to cut you off, but you have answered the question. Mr. Hughes, do you—are you aware of any facilities that are available for the type of detention or type of supervision of which you speak?

A. In Coles/Cumberland Counties, or the surrounding counties to my knowledge, there are no facilities that offer that type of environment, other than the department of corrections facilities in the northern part of the State.

Q. And that is the Illinois Department of Corrections?

A. Yes.

Q. Is there a particular division that would be able to handle that?

A. Just be speculating, I do recall there is a facility that is used

for evaluation and treatment of incoming cases, and I believe that is the St. Charles facility, but I may be incorrect.

Q. Does the adult facility also have similar programs?

A. Again I would be assuming they have relatively the same programs, yes."

The minor called Nancy Zang, supervisor of juvenile parole services for the Department of Corrections in the Champaign district. She testified regarding the secure treatment facilities available to the juvenile division of the Department of Corrections. Minors committed to the Department are statutorily discharged at age 21. The juvenile division presently has secure facilities for those minors in need of long-term psychiatric and psychological treatment. The Department's principal secure facility for juveniles is the Illinois Youth Center in Joliet. On cross-examination, Mrs. Zang stated that she had no first-hand knowledge of the programs available for offenders placed in adult facilities.

Don Parrott of the Department of Children and Family Services testified about the circumstances of the minor's early life. The minor's parents divorced when the minor was very young. R.L.L.'s mother was a very unstable person. His stepfather constantly belittled R.L.L., warning him that he would grow up to be "worthless like your dad." R.L.L. moved back and forth between his natural parents, never being allowed to stay in one place for very long. He dropped out of school in the eighth grade. He had several scrapes with the law during his early teenage years. He was finally adjudicated a neglected minor in March of 1981. The adjudication of neglect came about after R.L.L.'s stepfather had abandoned him and R.L.L. was arrested for breaking into a home in search of food and shelter. He was placed in the Dengler home at that time.

Psychiatric evaluations of R.L.L. were also admitted into evidence. All of the professionals who evaluated R.L.L. agreed that the minor had severe psychological problems and that he needed long-term psychiatric treatment in a secure facility. All of the professionals saw treatment of R.L.L.'s problems as difficult, but possible if R.L.L. was placed in a proper environment. Dr. Stephen Golding, professor of psychology at the University of Illinois, stated:

"There is no question in my mind that [R.L.L.] is the type of adolescent who absolutely must receive intensive psychological treatment for a prolonged period of time in a secure, institutional setting. It is in the best interests of both society and [R.L.L.] that he be placed in such a setting. While not wanting to sound overly alarmist about the situation, I must say, in all frankness, that if [R.L.L.] is simply tried as an adult and placed in an adult correctional facility, he will be, upon release, beyond the pale of all

rehabilitation and will also be quite likely to engage in further acts of violence."

The trial court denied the motion to allow R.L.L. to be prosecuted as an adult. The court stated that it was not satisfied that R.L.L. would receive proper psychiatric treatment in the adult system. Judge Watson stated:

"One of the disturbing problems I do have is quality of psychiatric treatment he will receive in adult facilities. I'm not very happy with it at all. It has finally come to the point where the adult facilities have admitted that the main purpose of adult facilities is to punish, not to rehabilitate. * * * I'm not very satisfied with the adult facilities. I'm not satisfied the psychiatric treatment I think is evidently needed and should be given to this individual for the benefit of society as well as himself will come from adult facilities. I'm also looking into this matter as an act of a child when he committed this crime—a very disturbed child. There is no way of guaranteeing what will happen whether he is put in adult or juvenile facilities. I feel it would be in the best interests of this society and this individual that he should stay in the juvenile facilities. And I would deny the motion."

A motion to reconsider was filed on December 23, 1981. The motion was denied. The State filed a motion for leave to file a direct appeal with the Illinois Supreme Court. The supreme court denied this motion, but directed this court to expedite our consideration of the appeal.

The State raises two points on appeal: (1) the trial judge violated the separation of powers clause of the Illinois Constitution by declaring that the purpose of the Department of Corrections is to punish, not to rehabilitate, offenders; and (2) the trial court abused its discretion in failing to allow R.L.L. to be tried as an adult.

■■ The State argues that the statement by Judge Watson that the main purpose of adult facilities is to punish, not to rehabilitate, constituted an unconstitutional exercise of legislative authority by a member of the judicial branch. We find the State's argument to be without merit.

Article II, section 1, of the Illinois Constitution provides for three branches of government: legislative, executive and judicial. A branch is supposed to exercise only the powers given to it by the Constitution and not powers assigned by the Constitution to the other branches of government. In the case at bar, Judge Watson was not exercising a legislative function. His remarks, when taken in context and as a whole, merely show that he felt that R.L.L. would have a better chance of receiving much-needed psychiatric treatment in a juvenile facility than in an adult facility supervised by the Department of Corrections. We note

that the State failed to offer any evidence as to the availability of psychiatric treatment in the adult facilities supervised by the Department of Corrections. The testimony of Michael Hughes on this point was, by his own admission, merely speculation. Judge Watson was doing only that which was required of him under section 2—7(3)(a)—exercising discretion in determining whether it was in the best interests of both the juvenile and society that this juvenile be prosecuted as an adult.

■■ The State argues that the trial court's decision is an abuse of discretion. The records shows that R.L.L. is a severely disturbed young man. His early life was hard and cruel; he lacked a feeling of acceptance and self-worth. The psychiatric reports introduced at the hearing on the motion indicated the necessity of long-term psychiatric treatment if R.L.L. is to have any chance at all to be rehabilitated.

The State offered very little evidence of the availability of psychiatric treatment in adult facilities. The evidence the State did offer was speculative. Nancy Zang, a juvenile worker called by the minor, testified regarding the availability of treatment facilities in the juvenile division of the Department of Corrections. The trial judge concluded that the best interests of both the minor and society would not be served by allowing the minor to be tried as an adult. Given the facts set forth in the record, we hold that the trial court did not abuse its discretion in denying the State's motion. (See *In re Burns* (1978), 67 Ill. App. 3d 361, 385 N.E.2d 22.) In so holding, we do not wish to deprecate the seriousness of the offense of murder. However, while we may have decided the case differently, we cannot conclude from the record that the trial judge abused his discretion. Therefore, we affirm.

Affirmed.

GREEN, P. J., concurs.

JUSTICE WEBBER, dissenting:

While I decline to advocate general interference with the discretion of a trial judge, I feel in this instance that he has predicated his judgment on false premises.

In making his ruling, the judge referred to R.L.L. as a "child * * * a very disturbed child." As a matter of strict technicality, the designation is correct. However, R.L.L. was within 5½ months of being an adult under the terms of the Juvenile Court Act. The offense was committed on April 23, 1981, and R.L.L. became 17 on October 1, 1981. The briefs of the parties point out, and I agree, that there is no mathematical certainty by which the tests of section 2—7(3) of the Juvenile Court Act may be

applied. In the same manner there is no mathematical certainty by which adulthood can be determined, except that one who is 16½ years of age is closer to that status under the Act than a 14-year-old. To say that one is a "child" because he is shy of 17 years by any amount of calendar time is to ignore reality. There was no evidence of either physical or mental retardation.

What is more important than the foregoing, which might be nothing more than a slip of the tongue by the trial judge, is the fact that no witness testified that R.L.L. might be cured, or even improved, in the time allotted. He could not be held beyond age 21, about 4½ years from the date of the offense, yet both the psychiatrist and the psychologist stated that his therapy would be "intensive and prolonged," "long-term." No explanation of these terms was offered. All of the professionals agreed that treatment would be difficult and that the prognosis was guarded. It does not seem to me that the trial judge truly took into account the safety of the public in determining that an individual capable of homicide should be released in 4½ years, when the evidence was clear that any modification of his behavior during that time was chancy at best.

Finally, I find the trial court's emphasis on rehabilitation to be out of line with current public policy. Professor Allen has adequately detailed the history and theory of rehabilitation in his recent book. (F. A. Allen, *The Decline of the Rehabilitative Ideal: Penal Policy and Social Purpose* (Yale University Press 1981).) He notes that it has been substantial and precipitous since 1970. In Illinois, as in some 30 other states, the death penalty has been reinstituted; our legislature has established Class X felonies, determinative sentencing, and further restrictions on probation. This does not indicate to me that public policy in this State is any longer aimed solely at rehabilitation. Some cases, of which the instant one is a good example, simply demand punishment.

I would reverse the trial court without remand.