(No. 57532.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. M.D., a Minor, Appellee.

*Opinion filed January 20, 1984.—Rehearing denied March 30, 1984.*

74

SIMON, J., dissenting.

Tyrone C. Fahner and Neil F. Hartigan, Attorneys General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel, and Nicolette Katsivalis), for appellee.

JUSTICE CLARK delivered the opinion of the court:

In this case, the State appeals from the trial court's denial, and the appellate court's affirmance of the denial, of the State's motion to permit prosecution of the minor respondent, M.D., as an adult under the criminal laws of Illinois instead of under the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 701 *et seq.*). A divided appellate court affirmed the judgment of the circuit court of Cook County (109 Ill. App. 3d 790), and we granted the State's petition for leave to appeal (87 Ill. 2d R. 315(a)).

Section 2—7(3) of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)) provides:

> "If a petition alleges commission by a minor 13 years of age or over of an act which constitutes a crime under the laws of this State, and, on motion of the State's Attorney, a Juvenile Judge, designated by the Chief Judge of the Circuit to hear and determine such motions, after investigation and hearing but before commencement of the adjudicatory hearing, finds that it is not in the best interests of the minor or of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws." Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).

In the instant case, the trial judge denied the State's petition requesting that the minor be tried as an adult, and the appellate court affirmed, holding that the trial judge had not abused his discretion by denying the State's motion. It is from this judgment that the State appeals.

The sole issue before this court is whether the trial judge abused his discretion by denying the State's motion to permit the prosecution of the respondent as an adult. We find that the trial judge did abuse his discretion, and we reverse the judgments of both the circuit and appellate courts.

A petition for adjudication of wardship was filed in the circuit court on January 28, 1981, alleging that respondent was delinquent in that on January 26, 1981, he allegedly committed murder by shooting and killing two individuals, Gregory and Vincent Jackson.

During the transfer hearing, Officer Ralph Vucko testified regarding a statement the respondent had made to him the night of the shootings. Respondent told Vucko the following. On January 26, 1981, at about 6:30 p.m., respondent allegedly went to the home of Izear Sewell, also known as "Tookie." Respondent alleged that his purpose in going to see Sewell was to ask Sewell for help because he had been hit across the face with a pistol by Gregory Jackson one week before. It appears that respondent went to Sewell's house armed with a gun and looking for, as he put it, "revenge." Sewell, according to respondent, agreed to help respondent and stated that they should "gun up." Sewell evidently had a gun on his person because respondent said that they both left without going into Sewell's house.

Respondent and Sewell then walked to a laundromat where they found Gregory Jackson. Respondent urged Sewell to "talk to the dude, he jumped on me a couple of times, man." Apparently, Sewell was telling Gregory Jackson to leave the respondent alone when, according to respondent, Gregory took a stick out of a garbage can and

began walking towards Sewell and respondent. Vucko interviewed three eyewitnesses, none of whom saw the stick Gregory Jackson was alleged to have had. Gregory allegedly called Sewell a "punk." Sewell shot Gregory, and respondent allegedly shot at Gregory, missing him. Respondent alleges that Vincent Jackson, Gregory's brother, also came towards them, and respondent stated that he shot Vincent four times. Sewell and respondent then ran to a nearby apartment where they hid the guns they had used on a shelf.

Vucko testified that the respondent did have scabs and marks on his face when he gave his statement and that respondent told him that they were the result of being hit in the face with a gun by Gregory Jackson a week earlier. Vucko testified that respondent also told him that the Jackson brothers were members of a gang called the "Q-Dogs," a subgroup of a gang called the "Vice Lords." According to Vucko, respondent told him that "he was not in a gang but he was harassed." Vucko testified that he had not heard of the "Q-Dogs," but that he was not assigned to the gang crimes unit of the police department and consequently was not familiar with all the names of the gangs in the district.

An investigator with the office of the public defender, Jeffrey Greenfield, also testified at the transfer hearing. Greenfield had interviewed a friend of the respondent's, Bernard Strowder. Strowder was alleged to have told Greenfield the following. Strowder had known respondent three or four years and the Jackson brothers for about two years. The Jacksons were, Strowder alleged, members of the "Q-Dogs," which was a subgroup of the "Vice Lords." On one occasion Gregory Jackson and another boy allegedly forced respondent and Strowder to give them money at gunpoint. On another occasion, Gregory Jackson was alleged to have hit the respondent with a stick, telling him "you owe me." Strowder also told Greenfield that there

was an occasion where respondent had been pistol-whipped by Gregory and that Gregory and Vincent Jackson had pushed respondent off of his bike and struck him on another occasion. Greenfield testified that he had heard of the gang called the "Q-Dogs."

Respondent's mother testified at the probable cause hearing before the judge that was presiding at the transfer hearing. She testified that on January 24, 1981, respondent and her nephew told her that Gregory Jackson and another boy had just threatened respondent with a gun. It appears that a microwave oven which was stolen from a railroad car was the subject of the dispute. Gregory Jackson wanted the oven, which he apparently believed the respondent had in his possession. Whether the dispute over the microwave was the actual reason for the alleged pistol-whipping on January 24, 1981, is unclear from the record.

In any event, the respondent's mother testified that the respondent had come upstairs to their apartment missing a shoe and that he and her nephew told her that Gregory Jackson had threatened the respondent with a gun. The mother also stated that she had sent the respondent to the store the morning after the incident and he had returned with his eye and face swollen. Respondent told his mother, according to her, that Gregory Jackson had beaten him up. Respondent's mother called the police, and a tape recording verifying her call was presented to the judge. The mother testified that after she called the police they never came and she did not bother to call them again.

Three reports were made in connection with this case— a social investigation report prepared by the respondent's probation officer, a psychological report, and a psychiatric report.

Vergus Hurks, respondent's probation officer, had prepared the social investigation report regarding the respondent, and he testified at the transfer hearing as to his findings. Hurks related the following. Respondent was

born on July 11, 1965, and was 15½ at the time of the hearing. Respondent lived at home with his mother and nine brothers and sisters in a public housing project, and his mother was receiving assistance from the Illinois Department of Public Aid. According to Hurks' report, the mother felt that the respondent's peer group associates were a negative influence in his life, resulting in his delinquency and truancy. The mother told Hurks that she had separated from the respondent's father in 1977 and that there was no male role model for the boy in their home. (There was conflicting evidence in the record as to whether respondent's stepfather was living in respondent's home. This particular point will be discussed later in this opinion.)

Hurks came in contact with the respondent when respondent was placed on probation for one year because of a finding of delinquency based on his commission of a burglary. Hurks testified that the probationary period was satisfactorily terminated on January 20, 1981. Hurks also testified that respondent had eight prior "station adjustments" dating from August of 1979 to October of 1980. Three of these "station adjustments" occurred during respondent's probationary period. "Station adjustments" involve situations where the police, after taking the juvenile to the police station, decide that the juvenile will not be prosecuted. Hurks testified that two of the respondent's station adjustments were for burglary, one for battery, three for theft, one for possession of stolen property, and one for attempted theft. Station adjustments have been held to be "probative and relevant because they enable the trial court to determine the proper disposition." *In re McClinton* (1978), 63 Ill. App. 3d 956, 959.

During his testimony, Hurks explained, "The mother cannot do anything with him. She cannot make him go to school, and that has been one of our biggest problems. I referred the case to the Garfield Park Comprehensive Health Center. They have been working with him approxi-

mately six to eight months. He lost interest in that agency and failed to keep his appointment with that agency." Since the respondent had been placed in the Audy Home for the murder of the Jackson brothers, Hurks had reports on his school performance. Respondent had failed almost all of his courses. One report Hurks read stated that respondent "refuse[d] to do any work, and he frequently spen[t] his time disrupting others by talking to them." Hurks testified that he had not found the respondent to show any remorse in regard to the murders or any of the other crimes he had committed. Hurks characterized the respondent as a shy, passive person and a follower. He also testified that he believed that the respondent had rehabilitative potential and could benefit from the programs the juvenile division of the Department of Corrections had which rewarded juveniles if they cooperated and followed the rules and regulations. He also believed that the respondent could benefit from the school programs at the juvenile division of the Department of Corrections. Hurks conceded that the respondent would go to the juvenile division and receive the benefit of the juvenile educational facilities up until his 21st birthday, even if he was tried as an adult.

Kimberly Merrill, a court psychologist who examined and tested the respondent, prepared a second report concerning the respondent. In her report, Merrill stated that the respondent scored in the mentally deficient range on the tests which she administered. She reported that the respondent, although 15, was only in the eighth grade, that his performance in school was poor, and that his attendance record revealed chronic truancy. Merrill indicated in her report that the test scores which placed the respondent in the mentally deficient range should be interpreted with caution. The reason she believed the scores should be interpreted with caution was because the respondent's situation, being charged with two murders, was causing him some

anxiety which she felt could alter his performance. Merrill described the respondent as "an extremely immature, even primitive, youngster who [was] decompensating under the stress of being in detention for murder." She also described him as being "a young man whose ego development never progressed past an early stage." She noted that his "sexual identity [was] very tenuous" and that he "sought to confirm his masculine identity through association with older boys and the use of weapons." According to her report, the data indicated "underlying anger, considerable impulsivity and an almost childish fascination with violence and instruments of violence." Merrill concluded her report by stating: "[Respondent] is dangerous, but he is not a hardened delinquent. He has reached the age of fifteen without acquiring appreciable socialization. He needs structure, limits and firm moral instruction. Long term residential placement is recommended, and [respondent] needs to understand that he can expect punishment for wrong doing. It should be emphasized that the moral environment provided by this placement will play a critical role in the development of [respondent's] emerging personality."

The last report received by the court was authored by Dr. Jaime Trujillo, a psychiatrist. Trujillo interviewed the respondent in the Detention Home. He described the respondent as coming to the interview "in a happy mood with a special gait, moving around in a very tough way." In this report, Trujillo noted that when he asked the respondent why he was in the Detention Home that "[respondent] said in a proud voice that it was on a count of murder." According to Trujillo, respondent said that he was raised "pretty much being allowed to do whatever he please[d]" but "[o]n occasions *** [his] mother ha[d] interfered with that." The respondent told Trujillo that his stepfather also interfered on occasion. Trujillo believed that the respondent's stepfather was the respondent's father figure

at home and that this man "apparently still lives with the mother." The respondent described his stepfather as a factory worker, who was a nice person and a good provider.

In his report, Trujillo evaluated the respondent's moral judgment. He stated, "As far as his moral judgment is concerned, as gathered from hypothetical situations, [respondent] claims that if anyone does anything to him which he doesn't like he is entitled then to take revenge because no one has the right to do anything which he doesn't like." Respondent told the psychiatrist that he "enjoys drinking and that as a matter of fact he drinks so much that he passes out and sleeps for several hours." The report states that he also "recognizes some enjoyment of marijuana but denies any involvement with other kind[s] of drugs."

The psychiatrist also interviewed the respondent's mother. According to Trujillo, the mother told him that respondent was very well behaved until he was 11 years old. After that time, the mother stated, he "started staying away from home, fighting, and going to the railroad tracks to steal." The reason the mother felt that his behavior changed was because "he got involved with older persons who have been in prison and who are involved with a lot of delinquent activities." The mother stated that the respondent had "come home completely drunk and probably high on drugs."

The last part of Trujillo's report was a section containing the doctor's impressions and recommendations. In this section, Trujillo writes,

> "If [respondent] is allowed to do whatever he pleases, things go OK but if he is frustrated, or if someone does something wrong he is entitled to some revenge and that revenge is not measured by any values or codes and it can be as big as destroying the other person without any concerns or remorse or sense of guilt for whatever happened because he feels justified because something was done to him in a wrong way at some particular point."

Trujillo further describes the respondent as a "dangerous boy," someone who he feels "should be treated in a closed, secured environment where good disciplinary measures are imposed upon him." He also recommended that "[i]n this placement he should have education aimed [at] overcoming his learning difficulties" and "individual therapy to try to deal with his lack of values and self-centeredness." The placement, Trujillo recommended, should be long enough for there to be a change in his behavior. Trujillo, in concluding his report, stated, "I believe that if he [respondent] is sent back to the streets he will be in bigger trouble because there isn't anything you can say to him to make him reason in a better way as far as his behavior is concerned."

After considering the reports that were submitted, the testimony and the arguments of counsel, the judge held: "Looks to me that the two victims were taking advantage of [respondent] and I believe that 'Tookie' used him, perhaps, to put him to work for him. And the mind—the understanding of the mind is such, I think, that he needs the services of the Juvenile Court System and the motion of the State will be denied."

As the appellate court correctly noted, a court of review in a case like the instant one must determine whether the trial court abused its discretion in making its decision to deny the State's motion to transfer the respondent to adult jurisdiction. 109 Ill. App. 3d 790, 794, citing *In re Burns* (1978), 67 Ill. App. 3d 361.

While the decision on permitting prosecution of a juvenile under the criminal law is a matter of judicial discretion, that discretion is limited and controlled by the standards set forth in the Juvenile Court Act. (See *People v. Taylor* (1979), 76 Ill. 2d 289.) Section 2—7(3)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a)) lists six factors which the trial court must consider in reaching its decision on whether to prosecute a particu-

lar minor as an adult under the criminal laws. Section 2—7(3)(a) provides in pertinent part:

"In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a).

In the instant case, the trial judge made no formal statement of reasons or conventional findings of fact. This court stated in *People v. Taylor* (1979), 76 Ill. 2d 289, that, "while no formal statement of reasons or conventional findings of fact are necessary, the juvenile judge must take care to preserve a record sufficiently explicit so that his exercise of discretion may be reviewed meaningfully." 76 Ill. 2d 289, 301.

The trial judge in the case at bar was not at all specific as to the reason or reasons he decided that the respondent should remain in the juvenile division of the Department of Corrections. However, we will examine the evidence in the record relating to each of the six factors and determine if the trial judge did abuse his discretion. At this juncture, it is interesting to note that the Juvenile Court Act has been amended so that currently 15- and 16-year-old juveniles are automatically tried as adults for the crimes of murder, armed robbery, rape and deviate sexual assault. (Pub. Act 82—973, eff. Sept. 8, 1982, Ill. Rev. Stat., 1982 Supp., ch. 37, par. 702—7(6)(a).) Respondent would therefore be automatically tried as a adult if the alleged murders in this

case had occurred after September 8, 1982.

The first factor the court was to consider was whether there was sufficient evidence upon which a grand jury might be expected to return an indictment against the respondent. There is no question that there was sufficient evidence upon which a grand jury could return an indictment for murder against the respondent. The respondent never argued that point since he had made a written statement to the police admitting the killings and there were at least three eyewitnesses to the crime.

The second factor to consider is whether there was evidence that the alleged offense was committed in an aggressive and premeditated manner. We cannot agree with the appellate court that the evidence concerning aggression and premeditation is unclear. The respondent left his home with a gun, elicited the aid of a friend who also had a gun, and hunted down the victims with the intention of getting "revenge." Even though respondent alleges that he asked his friend to "talk to this dude," that does not mean that there was no premeditation for the resulting murders, particularly in light of the fact that the respondent stated that Sewell said "let's gun up," before they went to find Gregory Jackson. Respondent's claim that no shots were fired until Gregory Jackson came towards him and his friend with a stick does not necessarily justify the murders. None of the eyewitnesses to the incident ever saw a stick. The appellate court reasoned that since there was some evidence that the Jacksons had physically attacked respondent in the past, he was justified in arming himself when he went to find Gregory Jackson. We cannot agree with the appellate court's reasoning. The respondent himself stated that he went to the laundromat with the gun to get revenge.

The third factor to be considered was respondent's age. Even though respondent was 15 at the time of the shootings, his experience was that of someone way beyond 15

years. There was evidence in the record to demonstrate that the respondent had come in contact with the police on numerous occasions, including being on probation for one year for burglary. Respondent admitted drinking alcohol until he was intoxicated, using marijuana, and enjoying sex with two different girl friends. These facts lead us to believe that the respondent, although fairly young in years, was not a stranger to adult experiences. Besides the fact that, as we previously mentioned, the respondent would today automatically be tried as an adult under the Juvenile Court Act as amended (Ill. Rev. Stat., 1982 Supp., ch. 37, par. 702—7(6)(a)), it is also clear that other 15-year-olds charged with crimes less serious than murder have been tried as adults in the past. (See *e.g., People v. Underwood* (1978), 72 Ill. 2d 124.) The respondent cites two murder cases in which orders denying transfer of a minor to adult jurisdiction have been affirmed by the appellate court. They are *In re R.L.L.* (1982), 106 Ill. App. 3d 209, and *In re Burns* (1978), 67 Ill. App. 3d 361. In both of those cases, however, there were important mitigating factors which are not present in the instant case. In *Burns*, not only did the juvenile not personally kill anyone, she tried to persuade her boy friend not to stab the victim. She was determined by the court to be a juvenile who was in serious need of psychiatric treatment. Also, in *R.L.L.*, the juvenile was severely disturbed and in need of long-term psychiatric care. Those cases are clearly distinguishable from the case at bar.

The fourth factor to be considered is the previous history of the minor. It is undisputed, as we have stated previously, that the respondent had eight prior station adjustments in addition to being on probation for a year on a burglary charge. We believe these facts speak for themselves. It is clear that the respondent is very familiar with the criminal justice system.

The fifth factor to be considered is whether there are

facilities particularly available to the juvenile division of the circuit court for the treatment and rehabilitation of the minor. We believe two points need to be raised in determining the weight to be accorded this factor. First, it is clear that if the respondent is transferred to the adult criminal courts and sentenced to imprisonment, he will still be confined in the juvenile division of the Department of Corrections until the age of 21, unless transferred to adult institutions at an earlier time after a hearing. (Ill. Rev. Stat. 1981, ch. 37, par. 705—10.) Second, there is an abundance of evidence in the record to establish the fact that although respondent was placed in programs in the juvenile division in the past, he was not benefitting from them in any recognizable way. The evidence in the record demonstrates that the respondent was not making an effort to cooperate or obtain the benefits the juvenile division had to offer. The respondent failed almost every course he took while placed in the Juvenile Detention Home, and it was reported that he was more of a distraction than anything else while present in the classroom. It was also reported that although respondent was given the opportunity to receive therapy and counseling at the Garfield Park Comprehensive Health Center, he lost interest and failed to keep his appointments. We believe these facts indicate that respondent could not really benefit from the programs which are particularly available to the juvenile court system.

Lastly, the court was supposed to determine whether the best interest of the minor and the security of the public required that the minor continue in custody or under supervision for a period extending beyond his minority. This case is a double-murder case. The respondent has been described as a person of lower than normal intelligence who is dangerous. The psychiatrist who examined him stated that if respondent were "sent back to the streets he [would] be in bigger trouble because there isn't anything you can say to him to make him reason in a better way as

far as his behavior is concerned." We believe that the evidence at the transfer hearing established that respondent may, and will, continue to be dangerous to himself and the public after he reaches the age of 21, and that it is in the best interest of the respondent and the public that he be tried as an adult for the murders of Gregory and Vincent Jackson. We agree with the dissenting justice in the appellate court that lack of intelligence and immaturity of personality in the commission of such a heinous crime does not entitle the respondent to the extraordinary protection and consideration of the juvenile court system.

In view of all the evidence presented in relation to each of the six factors the trial court was to consider in determining whether the respondent should be transferred to the criminal court for prosecution as an adult, we believe the trial judge clearly abused his discretion in denying the State's motion to transfer. In this case, we find the evidence to be overwhelmingly slanted towards adult prosecution.

Accordingly, for all the reasons stated, we reverse both the circuit and appellate courts and hold that the respondent should be transferred to the criminal court for trial as an adult.

*Judgments reversed;*
*cause remanded,*
*with directions.*

JUSTICE SIMON, dissenting:

This is the first reported decision I have found in which an Illinois reviewing court has reversed a juvenile court judge's decision that a minor should not be prosecuted as an adult. In *People v. Martin* (1977), 67 Ill. 2d 462, this court held that the State may appeal the denial of its petition to have a minor transferred from the juvenile justice system and tried as an adult. When the case reaches this court, the question is not "Should this juvenile be tried as

an adult?" The only issue is whether the trial judge abused his discretion in reaching his decision, irrespective of what that decision was. (*People ex rel. Davis v. Vazquez* (1982), 92 Ill. 2d 132, 141.) This position is entirely consistent with this court's treatment of the doctrine of abuse of discretion in all other cases, civil or criminal, adult or juvenile, pertaining to guilt or sentencing. How many times has this court stated that no matter whether we would have reached a conclusion opposite to that of the trial judge, our task is not to substitute our judgment for his? As long as the record supports the conclusion that the judge was guided by the factors mandated by statute, this court should not disturb his decision.

Contrary to what the State would have us believe, the record before us does not reveal a case that is so overwhelming under the statute that it requires that the juvenile be tried as an adult. Our personal reactions should not govern the outcome. We can look to only two sources for our decision: the statute and the record.

Section 2—7(3)(a) of the Juvenile Court Act lists six factors which the trial judge must consider in exercising his discretion. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a); see *People ex rel. Davis v. Vazquez* (1982), 92 Ill. 2d 132, 141-42.) Considering the record as a whole, there is ample support for the trial judge's finding that the interests of the juvenile and of society would be best served if this minor remained within the juvenile justice system. The majority argues persuasively that there is also ample evidence that he could have been tried as an adult. But that is precisely the point. The very heart of the notion of discretion is that only one judge is to exercise it. The statute here leaves the decision to the juvenile court judge. It is he who is in the best position to evaluate the six statutory factors, he who is best able to weigh both the interests of society and the interests of the juvenile, he who is most familiar with the differences in the programs and resources of the

juvenile and adult systems. It is also he who is best able to evaluate the demeanor and credibility of the witnesses who testify at the transfer hearing. This case is a difficult one, but when there is conflicting evidence the decision must remain where the legislature placed it, with the juvenile court judge.

No matter how we deplore the events which occurred, we cannot substitute our judgment for his. This case is a good example of the difficult decisions a trial judge must make. Questions of abuse of discretion seldom arise in easy cases; they arise only when the evidence supports more than one view.

This court has never elucidated the standard to be applied in evaluating a juvenile judge's exercise of discretion in a juvenile-transfer decision. Respondent directs us to available approaches. Whichever of these the court applied, I would find that the judge here did not abuse the discretion vested in him. In *Peek v. United States* (9th Cir. 1963), 321 F.2d 934, 942, an abuse of discretion was said to occur only when the trial judge's decision was "arbitrary, fanciful or unreasonable," or "only where no reasonable man would take the view adopted by the trial court." Is it not obvious not only that reasonable men can differ, but that here they have differed? The trial judge and two justices of our appellate court found evidence to support a denial of the transfer order in light of the six statutory factors listed in section 2—7(3)(a). Or, we can, following a different approach, regard a review for abuse of discretion as an evaluation not just of an ultimate decision, but of the process of reasoning used to arrive at that decision (*cf. In re D.H.* (1977), 76 Wis. 2d 286, 251 N.W.2d 196; *Commonwealth v. Moyer* (1982), 497 Pa. 643, 646-48, 444 A.2d 101, 103). Relying on this standard, I again find no abuse. The record contains evidence relevant to each of the six factors enumerated in section 2—7(3)(a), and it is to those factors that I now turn.

The first factor is whether there is sufficient evidence upon which a jury may be expected to return an indictment. Although in this case this is the clearest of the six factors, even it is not cut and dried, and we should not rush to conclude that only one decision is possible. I agree with the appellate court that "it is clear that there was sufficient evidence to support an indictment of the respondent for murder" (109 Ill. App. 3d 790, 794). However, the question is not whether the facts could support an indictment for murder, but whether a grand jury may be expected to return an indictment. I cannot agree with the majority's assertion that "[t]he respondent never argued that point since he had made a written statement to the police admitting the killings and there were at least three eyewitnesses to the crime." (101 Ill. 2d at 85.) Respondent admitted the *shooting;* he did not admit to *murder.* The eyewitnesses witnessed a *homicide;* however, the law characterizes many forms of homicide as justifiable or as a lesser crime than murder. (See, *e.g., People v. Alejos* (1983), 97 Ill. 2d 502.) *"Murder"* is a legal conclusion. Respondent's trial counsel argued vigorously before the trial judge at the probable-cause hearing that a grand jury might find sufficient legal provocation for respondent's conduct to view it as self-defense. In stark contrast to the State's portrait of a lawless and uncontrollable individual bent on violence and destruction of human life, the record contains evidence supporting the characterization of respondent as a physically small youth who had been harassed and abused over a period of time by the victims here—older, bigger, and stronger members of a street gang which he refused to join. On more than one occasion respondent had been beaten and had once been pistol-whipped by them. On the night before the fatal incident, respondent's mother had telephoned the police to complain that the Jacksons were "beating up on" her son; this was established by the admission of the police file tape of that

phone call into evidence. Had the police responded to the mother's call for help, perhaps what followed might not have taken place.

Respondent had reason to fear the Jacksons. He knew they used deadly weapons—they had harmed him with those weapons before. He asked "Tookie," an older friend, to tell the Jacksons to leave him alone. He waited outside while "Tookie" talked with the Jacksons, and he fired only after he saw one of the Jacksons coming toward him with a stick, and after "Tookie" fired first. In addition, the psychologist's and psychiatrist's reports both state that respondent is an immature, impulsive person. Given all of this evidence, a grand jury could have returned an indictment for voluntary manslaughter instead of for murder. Whatever the grand jury would have done, as we now review the trial judge's exercise of discretion, we know that the judge had before him evidence on both sides of this issue.

Many of the same facts are relevant to the second statutory factor: Was the alleged offense committed in an aggressive and premeditated manner? I agree with the appellate court that the trial judge could have concluded that these were not premeditated killings (109 Ill. App. 3d 790, 794). The majority emphasizes respondent's statement that he went to the laundromat to meet Gregory Jackson to "get revenge." (101 Ill. 2d at 85.) Considering respondent's age, his mental capacity, and his immaturity, as well as his past experiences with these victims, this statement is far from a clear indication that he planned to kill either one of the Jacksons. To a child-like mind, revenge could mean any of a number of things. As respondent's juvenile record indicated, he had a history of property crimes, not of violent behavior directed at other human beings. The psychiatric, psychological, and social reports taken together described him as a passive individual, a follower, and as impulsive. The trial judge could have concluded that this is not the

kind of individual who plans and executes cold-blooded murder.

Respondent had reason to fear Gregory Jackson, who had treated him brutally and had not responded to repeated pleas to leave him alone. At the time of these tragic events, respondent was 15 years old and stood only five feet tall. Gregory Jackson was 18 years old and was approximately six feet tall, Vincent Jackson was 20 years old and was approximately five feet, nine and one-half inches tall. Both Jacksons were members of a street gang called the Q-dogs, and had harassed respondent for refusing to join that gang.

It is true that respondent had a gun with him when he went to "get revenge," but there is no evidence that he planned to shoot either of the Jacksons. Since Gregory Jackson had been armed when he had harassed respondent on previous occasions, respondent might have believed that Gregory would be less vicious toward him if Gregory knew that this time respondent was also armed, and could strike back if Gregory attacked him again. The record reveals that respondent did not go into the laundromat brandishing his gun and threatening anyone. He waited outside while his older friend "Tookie" went inside to "talk to the dude." None of the eyewitnesses saw respondent's gun before the Jacksons emerged from the laundromat. Respondent told the police that Gregory Jackson came toward him with a stick. Under these circumstances, the respondent could have believed that it was necessary to act in self-defense. There is no dispute that respondent did not fire until after "Tookie" fired at Gregory Jackson. The judge could conclude that this was not premeditated murder but the confused reaction of a young and immature adolescent who asked an older friend to help him out of a situation he could not handle himself, and found himself facing two tough gang members whom he knew from experience would not hesitate to hurt him.

What did respondent mean when he took the gun and stated that he was going to get "revenge"? It is unclear from the record whether respondent brought the gun or whether "Tookie" provided it for him after "Tookie" suggested, "Let's gun up." There is no evidence that respondent owned or had access to any gun prior to this incident. Even assuming that the trial judge believed that respondent meant to get revenge with the gun, this does not mean that he intended to kill the Jacksons. Assuming the worst case, that respondent's immature mental and emotional processes led him to seek an "eye for an eye," the judge could logically conclude that respondent meant to get revenge by using the gun to pistol-whip Gregory Jackson as Gregory had done to respondent.

The professional opinions make it clear that this respondent did not customarily plan his actions in advance. He is described as a follower, and as one whose ego development never progressed beyond an early stage. The ability to plan does not usually emerge until a late stage of ego and cognitive development. The professional reports indicate that respondent reacts to events without much forethought and in an immature and impulsive manner. Psychological test results, achievement tests, and poor academic performance all confirm his limited intellectual abilities, further increasing the likelihood that the trial judge could conclude that the respondent was not likely or even able to develop a sophisticated or intricate plan for revenge. While it might seem obvious to many persons that anyone who takes a gun and seeks out a known troublemaker must have at least planned for the eventuality that he might have to use the gun, as judges we cannot assume in advance of trial that respondent thinks, reasons, and reacts as they would. To the contrary, the picture which the professionals paint of the respondent is of one who lives for the moment, reacts on the instant, and did not, perhaps could not, premeditate. Considering all of the infor-

mation available to him, the trial judge could have concluded that these killings were not premeditated, at least as far as the respondent was concerned. After considering the evidence, the judge noted that "[it] looks to me that the two victims were taking advantage of [respondent] and I believe that 'Tookie' used him ***."

The third factor in section 2—7(3)(a) is age. In *In re Burns* (1978), 67 Ill. App. 3d 361, the appellate court refused to rule that the trial judge had abused his discretion by denying a similar transfer order for another 15-year-old juvenile. Respondent M.D. was also 15. His life, too, like Myra Burns', had been a series of unfortunate experiences against a backdrop of a chaotic environment. The probation officer, testifying for the State in this case, called attention to the instability of respondent's environment. The majority attempts to distinguish this respondent from the juveniles in *In re Burns* and *In re R.L.L.* (1982), 106 Ill. App. 3d 209, apparently on the grounds that those juveniles were seriously mentally disturbed, implying that M.D. was not. This "distinction" is belied by the mental health reports in evidence, and will be discussed in connection with the fourth and fifth statutory factors.

This would be a different case if respondent were two or three days away from the statutory majority. He was not. He was only 15, and while the statute permits his trial as an adult, it also directs that his age be factored into that decision. Try as I may, I cannot see the relevance of the majority's emphasis on the facts that "[r]espondent admitted drinking alcohol until he was intoxicated, using marijuana, and enjoying sex with two different girl friends," as indicating maturity or fitness for trial as an adult (101 Ill. 2d at 86). While I do not condone such behavior, section 2—7(3)(a) does not direct judges to inject their morals or their personal values into this decision. Unfortunately, from what I read, I conclude that the use of marijuana and alcohol and sexual promiscuity are rampant

among the patrons of the juvenile court, and among a large number of other teenagers as well. If anything, engaging in this type of conduct indicates to me immaturity rather than maturity. This conduct may be an offense in its own right, but respondent is not charged with any offenses of this kind. Such behavior is not a basis for distinguishing between juvenile offenders who are tried as adults and those as juveniles. This kind of behavior is not mentioned in section 2—7(3)(a) as a test of whether a minor should be tried as an adult. My guess is that juvenile courts would have little to do if it were.

The 1982 statute requiring 15-year-olds charged with certain crimes such as murder to be tried as adults (Pub. Act 82—973, eff. Sept. 8, 1982, 1982 Ill. Laws 2458, Ill. Rev. Stat., 1982 Supp., ch. 37, par. 702—7(6)(a)) is also irrelevant. The offense charged here took place before the effective date of that enactment. The actions of a later legislature cannot control our decision in this case. It is equally irrelevant that "other 15-year-olds charged with crimes less serious than murder have been tried as adults in the past." (101 Ill. 2d at 86.) *People v. Underwood* (1978), 72 Ill. 2d 124, a case cited by the majority, was a case in which the trial judge ordered the transfer, and this court affirmed that exercise of discretion. (101 Ill. 2d at 86.) Here, however, the question is not whether these facts would support a decision to try this respondent as an adult, as in *Underwood*. Rather, the question is whether the juvenile court judge abused his discretion in deciding not to transfer this case to the Department of Corrections under the statute operative at that time and the totality of facts and circumstances as they reasonably appeared to the trial judge.

The fourth factor is the previous history of the minor. I do not agree that the minor's eight prior station adjustments "speak for themselves." (101 Ill. 2d at 86.) Station adjustments are police matters on which no further legal

action is taken. They require no showing that respondent was actually guilty of anything. The majority of the station adjustments which concerned the respondent, while serious, were for property-related crimes: burglary, theft, possession of stolen property, and attempted theft. Further, although the juvenile court judge may consider station adjustments, he is also entitled to give them the weight he believes they deserve. The respondent has no history of crimes against individuals, except one unexplained station adjustment for battery, and no history of the possession or use of weapons of any kind. This record is consistent with the information in the social, psychological, and psychiatric reports. The trial judge could have concluded that respondent is the sort of individual who will become violent if provoked, but who will not seek out confrontation.

The testimony of Vergus Hurks, respondent's probation officer, is extremely important. Although a State's witness, Mr. Hurks refused to be led by the State's suggestive questioning. Respondent was on probation for one year on his only prior adjudicated charge, a burglary. Mr. Hurks said at various points that he believed respondent was still in an "adolescent formative state," that he "showed respect" to his probation officer, and that he was "immature" and "impulsive." Most important, Mr. Hurks stated he did not get the impression that respondent was proud of these killings, and that in the probation officer's opinion, respondent had rehabilitative potential.

Respondent's history also includes the following circumstances: His parents were separated in 1977. He was a member of a large family which may or may not have had a male role model present. He resided in a housing project in which delinquency was rampant. His mother could not or did not control him. His school performance and attendance were chronically poor. He had been harassed by gang members for refusing to join a gang, and he was unable to defend himself against gang threats or physical violence.

The gang situation was so bad in the neighborhood that the mother of another boy who had also been harassed by the Jacksons sent the boy to Mississippi to get him away from them.

Evidence of respondent's history and emotional and psychiatric problems is properly considered in conjunction with his age. (See *In re R.L.L.* (1982), 106 Ill. App. 3d 209; *In re Burns* (1978), 67 Ill. App. 3d 361, 365-69.) I have detailed respondent's emotional and intellectual problems throughout this dissent, and I will not repeat them. I do, however, point out that while the probation officer, the psychologist, and the psychiatrist used different technical terms to describe respondent, all three emphasized his severely delayed personality development, his impulsivity, and his limited intellectual capabilities. The psychologist, Dr. Kimberly Merrill, was the only one of the three professionals to do extensive intellectual and personality testing. On the basis of the detailed information provided by these tests, Dr. Merrill was concerned about respondent's lowered mental capacity and the abnormal personality development. All three professionals used terms of art which effectively described respondent as seriously disturbed and in need of immediate, intensive, long-term treatment.

Fifth is the question whether there were facilities available to the juvenile court for the rehabilitation and treatment of the minor. Despite the contradictions elsewhere in the record, this point is clear. Mr. Hurks, a juvenile probation officer familiar with this respondent, as well as with the facilities available, and with respondent's experience with those facilities in the past, stated that respondent had rehabilitative potential. Dr. Merrill wrote, "At this point he is still very much a blank slate, and the next four or five years are therefore critical to the eventual formation of his personality. If he is placed in a brutal and hostile environment, he has none of the ego resources which will allow him to withstand the character molding effects of these in-

fluences." Further, "[h]e needs structure, limits, and firm moral instruction. Long term residential placement is recommended, and [respondent] needs to understand that he can expect punishment for wrongdoing. It should be emphasized that the moral environment provided by this placement will play a critical role in the development of [respondent's] emerging personality." Dr. Jaime Trujillo, a psychiatrist who examined respondent and prepared a written report, said, "He hasn't been too able to learn and he seems to have some limitations as far as intelligence \*\*\* which makes him an easy prey for persons who could socialize with him and try to induce him into certain criminal activities without him having full understanding \*\*\*. I feel that he should be contained at the present time and that ideally he should be treated in a closed secured environment where good disciplinary measures are imposed upon him \*\*\*. In this placement he should have education aimed to overcoming his learning difficulties. There he should have individual therapy to try to deal with his lack of values and self-centeredness."

Together the three professionals describe a youth who is limited intellectually and has thus far been unable to benefit from either his family or school environment. At the same time, all three note that his personality and his intelligence are still developing. All see some possibility for change, for development of a mature personality and of his fullest intellectual potential, whatever that is, if, and only if, he receives immediate and intensive professional help in several areas. He requires extensive remedial education, intensive individual psychotherapy, removal from the chaotic and threatening environment with which he cannot cope and the influence of hardened criminals who will turn him to their own purposes, and long-term residential placement in a highly structured environment in which a systematic pattern of rewards can be used to influence and redirect his behavior. The professionals stress the seriousness of re-

spondent's problems, and the irreversible harm that would be done by returning him either to the streets or to a hostile, threatening environment. From these consistent descriptions of respondent's personality and intellectual abilities, the trial judge could conclude that the apparatus of the juvenile court system was particularly well suited for the rehabilitation and treatment he required and for shaping personality development which offered the only chance for the respondent to become a useful and nonviolent member of society. All three reports seem to agree that, whatever he is now, placing respondent in a penitentiary would insure that he emerged a criminal. On the other hand, the trial judge could conclude from the evidence that respondent could benefit from placement in the type of highly structured residential treatment facility which is available to the juvenile division.

The majority implies that because respondent failed his classes while he was in detention and did not keep his appointments at an outpatient mental health center, the respondent has shown that he "could not really benefit from the programs which are particularly available to the juvenile court system." (101 Ill. 2d at 87.) On the basis of the facts set out above, the trial judge could conclude otherwise. Respondent may have failed his classes because of his limited mental abilities, or because the educational programs at the detention facility were not highly structured enough, or not geared to his current level of functioning. It would not be at all surprising that an adolescent performing, as respondent was, at a second- to fourth-grade level would fail classes geared to his chronological age of 15. In light of his mother's inability to control him, it also is not surprising that he failed to attend outpatient sessions which he had to get to on his own. The programs available to individuals in 24-hour residential treatment are more intensive and, since they are provided on a frequent and regular basis, they cannot be avoided by failure to show up.

The trial judge could have concluded that, although respondent had not been able to utilize the sporadic services provided while he was still subject to the negative influences of the gangs and his disordered home environment, he might benefit from the intensive services available in a structured living situation.

The final statutory factor is whether the best interest of the minor and the security of the public require that the minor continue in custody or under supervision for a period extending beyond his minority. None of the professionals hypothesized as to how long it would take for respondent to change appreciably; all said that he required intensive, *long-term* intervention. Respondent could remain in juvenile facilities until the age of 21. Since he was 15 at the time of the transfer hearing, that would have been placement for five to six years, which appears to be long term, considering the usual length of psychiatric and psychological inpatient treatments. There is no indication in any of the reports that respondent would need confinement beyond the age of 21. The judge could have concluded that the best interests of the minor did not require transfer to the adult system for that reason.

What of the best interests of the public? To this point, I have focused, as the statute directs, on the interests of the juvenile. However, I believe the juvenile court judge here could have concluded that society, too, is best served by retaining the respondent in the juvenile system. Since the professionals agreed that a hostile environment would be harmful to the respondent, the judge could infer that the result of a jail sentence would be to increase the respondent's tendency to violence, and thus make him more dangerous to society when he was released than he was at the time of the hearing. By contrast, he stood a chance to benefit from the structured, intensive programs available in the juvenile division. If he became less likely to commit future crimes, society would benefit.

If the State's Attorney actually believed that the security of the public required respondent's immediate confinement, I do not believe he would have pursued the appeal to this court. After the appellate court affirmed the juvenile court, the State's Attorney could have chosen to proceed in the juvenile court, with the strong likelihood that the respondent would have been adjudicated a delinquent and detained in a juvenile facility many months ago. Instead, the State's Attorney chose to pursue this appeal, thus returning respondent to the streets during the pendency of the appeal. Respondent has been at liberty instead of confined in a juvenile detention facility at least since the appellate court decision in this case more than a year ago. The State's Attorney has not brought to the attention of this court that the respondent has committed any violent crimes during the period he has been at large while this appeal has been pending.

Moreover, the juvenile court judge might have anticipated, on the basis of the evidence placed before him, that even though the defendant was charged with murder, the likelihood was that he would be convicted of a lesser crime. In that event, the juvenile court judge could have been troubled by the possibility that a criminal court judge might treat respondent leniently because of his age. By committing the respondent to a juvenile facility, the juvenile court judge knew that the respondent would be confined there for the period of his sentence, which the judge himself could fix with the security of the public in mind.

The majority states that "lack of intelligence and immaturity of personality in the commission of such a heinous crime does not entitle the respondent to the extraordinary protection and consideration of the juvenile court system." (101 Ill. 2d at 88.) I disagree on two grounds. Based on everything in the record, it would appear possible to conclude, as the trial judge apparently did, that respondent was precisely the kind of individual for whom the juvenile

system was designed. Even if the judge did not think along quite these lines, certainly "low intelligence and immature personality" are not reasons to *deprive* an individual of the protections of the juvenile system. Are we now going to lock up the mentally retarded and psychologically infirm as was done in the nineteenth century? The majority's underlying concern appears to be the heinous nature of the crime. I, too, deplore the senseless loss of life in this case. Nevertheless, the statute in effect at the time did not allow the nature of the crime to be the sole element in a transfer decision. As I have pointed out above, the 1982 version of section 2—7(3)(a), under which a 15-year-old charged with murder would be tried as an adult, is irrelevant to this case. The trial judge was bound by the then current statute to consider all six enumerated factors, and to use his own discretion in deciding how much weight to give to each. I respectfully submit that the judge here did not abuse his discretion. The trial judge did not accept the State's Attorney's argument that "[n]aturally, he has to consider a murder charge. Take that away no one would ask that he be transferred." Indeed, if the judge had allowed the charge alone to control his decision in the way the prosecutor suggested he should do, he would have abused his discretion for he would have delegated it wholesale to the State's Attorney.

Having reviewed the record, I am not persuaded by the State's unsubstantiated suggestion that the juvenile court judge did not consider the statutory factors and perhaps did not read the written reports. The judge's remarks during the hearing demonstrate that he gave his attention to the six factors and to the input provided by the social, psychological, and psychiatric reports. When the State's Attorney asked the probation officer to testify to the contents of one of the reports, the judge said, "The clinical will speak for itself. I will read these overnight, and I will decide tomorrow morning." And again, "You are asking the social

worker to interpret the psychologist's report that I am going to read myself." When the judge ruled, he said: "Looks to me that the two victims were taking advantage of [respondent] and I believe that 'Tookie' used him, perhaps to put him to work for him. *And the mind—the understanding of the mind is such,* I think, that he needs the services of the Juvenile Court System ***." (Emphasis added.) The State's Attorney who participated in the hearing had no doubts that the trial judge was familiar with the mental health evidence. When he moved to have the reports preserved in the record for appeal, he said, "[A]s Your Honor knows, during the course of the hearing we heard from and saw both the social investigation, psychiatric, and the clinical."

I end as I began by pointing out that this court should not substitute its judgment for that of the tribunal charged with the responsibility of fact finding when a factual basis supporting its decision appears in the record. I therefore conclude that there has not been a sufficient showing of abuse of discretion to warrant reversal.