648 N.E.2d 1043 (1995)
271 Ill. App.3d 673
208 Ill.Dec. 121
In the Interest of R.T. and J.B., Minors (The People of the State of Illinois, Petitioner-Appellant, v. R.T., and J.B., Minors, Respondents-Appellees).
Nos. 1-94-0099, 94-0101.
Appellate Court of Illinois, First District, Third Division.
March 31, 1995.
Jack O'Malley, State's Atty., County of Cook, Chicago, for appellant; Renee Goldfarb, Gael O'Brien, and Elizabeth A. Scholtz, of counsel.
Rita A. Fry, Public Defender, Chicago, for appellees; Cary M. Berman, of counsel.
Justice CERDA delivered the opinion of the court:
The State filed a petition for adjudication of wardship alleging that the minor-respondents R.T. and J.B. were delinquent in that, on or about November 19, 1991, they committed the offenses of, inter alia, first-degree murder, aggravated kidnapping, and aggravated criminal sexual assault. The State filed a motion pursuant to section 5-4 of the Juvenile Court Act of 1987 (705 ILCS 405/5-4 (West 1992)) to permit the transfer of the respondents to the jurisdiction of the criminal division of the circuit court for prosecution as adults under the criminal laws. The trial court denied the motion after a hearing. The issue on the State's appeal is whether *1044 the court's decision was an abuse of discretion.
The allegations in the petition arose after Robert Veal, a co-offender, gave a statement to the police detailing respondents' participation in the rape and shooting death of 14-year-old Cateresa Matthews. At the transfer hearing, the court heard the following evidence regarding the offense and investigation. The victim's mother testified that on November 19, 1991, Cateresa telephoned from her grandmother's house to tell her mother that she was on her way home from school. When Cateresa did not arrive as expected, Mrs. Matthews reported her as missing to the Harvey Police Department. Two-and-a-half weeks later, Cateresa's body was found.
Tasso Kachiroubas, an investigator with the Illinois State Police, also testified at the hearing. On December 8, 1991, he reported to a grassy, wooded area off of Interstate 57 in Dixmoor, Illinois, pursuant to an assignment to investigate the victim's death. He found the victim lying on her back with her legs spread. She was wearing a New York Yankees shirt, and had white panties around one of her ankles and a "purple-type jean material" draped across her chest, stomach and thighs. A .25 caliber spent shell casing was on her chest. Blood was coming from her mouth and she had bruises on the right side of her face.
On December 17, 1991, Kachiroubas spoke with Nicole Gandy, the victim's friend and classmate. Gandy told him that when she last saw the victim enter her grandmother's house on November 19, the victim was wearing a Bulls sports team coat, a New York Yankees shirt, purple jeans, black-and-white gym shoes, a gold earring, and a gold and emerald ring.
On October 29, 1992, Kachiroubas interviewed Robert Veal and obtained a written statement describing the circumstances of the offense. The statement was admitted into evidence at the hearing over defense counsels' objections. In the statement, Veal stated that he was riding around in a car with R.T. and two other individuals named "James" and "Sheyene" when they saw J.B. walking with the victim. James stopped the car and told them to get in, which they did. They drove around for a few minutes before James parked the car next to a field and they exited the vehicle.
Shortly thereafter, J.B. punched the victim in the face, and she returned to the car crying. James talked to her and told her to take a walk with him, and they walked away down the road until they were out of sight. When they returned an hour later, they were holding hands. James winked at J.B., and he and the victim walked towards a field with the rest of them following. They walked down a path to get to the field, and once there, James threw the victim to the ground and gagged her.
R.T., J.B., Veal and Sheyene held the victim down while James took off her coat, jeans and panties. James, R.T., J.B. and Sheyene then each took turns raping the victim while the others held her arms and legs. As each finished, they switched places with someone else. (Veal's statement indicates that he did not have sex with the victim, but did hold her down.) When the last one finished, James pulled out a gun and stood over the victim. He extended his arm, pointed the gun at her head, and fired one shot. At that point, the victim, who had been fighting the group the entire time, stopped fighting. J.B. took the victim's coat and removed a ring from her finger, and the group returned to the car. Veal's statement did not indicate the date of the offense.
The State also offered the autopsy report into evidence. The report listed the cause of death as a gunshot wound to the mouth which penetrated the skull, and the date of death as December 8, 1991. The report noted that the victim had a "moderate amount of dried mud" on the right side of her face. In addition, the medical examiner found that "[t]here is no evidence of injury to the genitourinary tract. There is mild vulvar erythema along the medial aspect of the left labia majora. No other evidence of injury is noted."
The court also heard a stipulation regarding a reported sighting of the victim by Barbara McClusten, an employee of a hotel located in Hazelcrest, Illinois. McClusten *1045 claimed to have seen the victim in room 208 of the hotel on November 22, 1991. The victim was with a white male companion and appeared to be at ease and not being held against her will. McClusten also saw the victim and the same companion on November 29 and 30. Police investigation of the hotel records revealed that a man named Jessie Jefferson was the occupant of room 208 on November 22. Jefferson, a black male, stated that he was at the hotel on November 13 or 14 with a woman named Ruth Brown, and that he and Brown went to the hotel monthly. Further investigation of the hotel records for November 13, 14, 21, and 23 revealed that Jefferson was not a registered guest on those days.
Additional evidence presented at the hearing included the stipulated and in-court testimony of Larry Sachs, the assignment coordinator for the juvenile division of the Illinois Department of Corrections. Sachs testified to the similarities and differences between the juvenile and adult correctional facilities, and the relative availability of programs and services. In addition, the parties stipulated that if respondents were tried as adults, they faced a possible sentence of 20 years to natural life in prison.
The court also considered numerous sources of social and background information regarding respondents. With respect to J.B., the court heard testimony from J.B.'s former probation officer, and a written social investigation report prepared by his current probation officer was entered into evidence. In that report, Probation Officer Simon concluded that "if there is to be major changes in [J.B.'s] life, it could only come from professional therapeutic intervention for many years into the future longer than the juvenile system could provide for [him]."
With respect to R.T., the court heard testimony from R.T.'s father, mother, and grandmother regarding his behavior at home and his response to parental discipline. Jerry Archie, R.T.'s teacher in the juvenile detention center, and Patricia Banks, his former school counselor, testified to his current and former academic performance and behavior in school. Levis Sellers, R.T.'s probation officer, also testified, and his social investigation report was entered into evidence. Finally, court psychologist Catherine Wilson and psychiatrist Dr. Anthony Marchlewski both examined R.T., and their written reports were also entered into evidence. Sellers, Wilson, and Marchlewski all concluded that R.T. could benefit from the rehabilitation provided within the juvenile system.
At the conclusion of the hearing, the trial court ruled that six of the seven factors enumerated in the transfer statute were satisfied and favored transfer. However, it then found that there was insufficient evidence upon which a grand jury would be expected to indict, and it denied the State's transfer motion.
Section 5-4(3)(b) of the Juvenile Court Act of 1987 lists several factors which a Juvenile Court judge must consider in deciding whether a minor should be prosecuted as an adult. (705 ILCS 405/5-4(3)(b).) Although the trial court's inquiry is not limited to the statutory factors (see People v. Clark (1987), 119 Ill.2d 1, 14, 115 Ill.Dec. 613, 518 N.E.2d 138), the court must at a minimum consider:
"(i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority; and (vii) whether the minor possessed a deadly weapon when committing the alleged offense."
(705 ILCS 405/5-4(3)(b).) The transfer hearing is not adjudicatory in nature; the State need only present sufficient evidence to persuade the court that a transfer is warranted. (People v. Taylor (1979), 76 Ill.2d 289, 303-04, 29 Ill.Dec. 103, 391 N.E.2d 366.) While the juvenile court judge is granted wide discretion in making the decision whether to *1046 waive jurisdiction over the minor, we will reverse where the decision is a result of an abuse of discretion. People v. M.D. (1984), 101 Ill.2d 73, 83, 77 Ill.Dec. 744, 461 N.E.2d 367.
In the instant case, the State contends that the trial court's determination that there was insufficient evidence upon which a grand jury would indict was erroneous, and that the court therefore abused its discretion in refusing to transfer respondents solely on the basis of this factor. Respondents argue that the court's decision was not an abuse of discretion because the court carefully scrutinized the evidence and took into consideration the reliability of that evidence.
In discussing whether a grand jury would be expected to return an indictment, the trial court commented on the evidence. It noted, for example, that based on the autopsy report, "the rape counts may fail." In addition, the court stated its belief that "somebody made a mistake in this casemistakes. It may be the [medical examiner] himself. * * * He said there was some mud on her face, no bruises. The medical examiner made mistakes here * * * You look at the pictures in the exhibits, the girl is bruised." The record indicates, however, that the court was most concerned with the fact, which it called "key" to its decision, that the victim's date of death conflicted with the date of the occurrence as specified in the State's petition for adjudication of wardship. The court stated that,
"[t]he Grand Jury is going to wonder about that. They are going to have that inconsistency: When was she killed? * * * [T]here are defects in the case which will be brought to the attention of the Grand Jury and the Grand Jury will say, `No. How could they charge these guys were killing and raping this girl on November 19? She didn't die until December 8.'"
The court further found that even if the grand jury did indict and the case went to trial, "these boys will walk, * * * because they are not going to find them guilty of murder on the date of the charge against them." The court concluded that in the criminal division, the date reflected in the indictment could not be amended before trial. On the other hand, if retained in the juvenile division, the date on the petition could be amended before trial, after the State investigated further. Therefore, the court denied the State's motion.
We conclude that the trial court's decision was an abuse of discretion. The court's comments indicate that its finding was based upon an erroneous assumption that evidence of the actual date of the offense could not be presented to the grand jury, and somehow a conflicting date listed on the juvenile petitions would be seriously detrimental. Even assuming that the November 19 date is incorrect, there exists no legal requirement that in seeking an indictment, the State would be bound to draft an indictment which conforms with a prior juvenile petition signed by someone connected with the matter.
In addition, the trial court erroneously contemplated the likelihood of the State's ultimate success at trial. Because a transfer hearing does not adjudicate guilt, the transfer statute does not require such a level of proof. The inquiry in a transfer hearing is only whether a grand jury may be expected to indict, and the State need only establish probable cause "that a person has committed an offense." (725 ILCS 5/112-4(d) (West 1992) (standard for obtaining a grand jury indictment).) "Some evidence" in support of the criminal conduct charged is sufficient. (People v. Edwards (1993), 243 Ill.App.3d 280, 285, 183 Ill.Dec. 548, 611 N.E.2d 1196.) The hearsay testimony of an investigating officer summarizing the events of an investigation is sufficient to support an indictment so long as the officer is a competent witness. (People v. Cora (1992), 238 Ill.App.3d 492, 502, 179 Ill.Dec. 623, 606 N.E.2d 455.) After reviewing the record, we find that the State presented sufficient evidence upon which a grand jury would be expected to indict. Because the court relied solely on this factor in denying the motion, we find that the court abused its discretion in failing to transfer respondents to the criminal division.
Accordingly, the order of the circuit court is reversed and the cause is remanded with directions to enter an order transferring respondents *1047 to the criminal division for adult prosecution.
Reversed and remanded.
RIZZI and TULLY, JJ., concur.